Bobbie **GRANT**, Appellant,

v.

**JOE MYERS TOYOTA, INC.**, Appellee.

No. 14–98–01210–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Jan. 20, 2000.

Peter Costea, Houston, for appellants.

Mark Lapidus, Jill Suzanne McCarthy Arntz, Houston, for appellees.

Panel consists of Chief Justice MURPHY and Justices ANDERSON and HUDSON.

## MAJORITY OPINION

PAUL C. MURPHY, Chief Justice.

After appellant Bobbie Grant (Grant) filed suit against Joe Myers Toyota, Inc. (Joe Myers) alleging religious discrimination, Joe Myers moved for a no-evidence summary judgment. The trial court granted this motion. Grant now appeals, claiming this ruling was in error. We reverse the judgment of the trial court as it pertains to Grant's religious discrimination claims, affirm the judgment of the trial court as to the other claims raised in Grant's petition, and remand the case for further proceedings.

### FACTUAL AND PROCEDURAL HISTORY

Grant went to Joe Myers to seek clerical employment. She was informed by the secretary that no clerical positions were open, but there were openings in sales. Since Grant had no training, the receptionist provided her with the name of the organization providing sales training for Joe Myers, Automotive Sales Training (AST). Grant called AST from Joe Myers and arranged to attend a two-week training class. The class was to be taught by Dick Smouse, the owner and operator of AST.

When Grant went to the class, she paid a registration fee and received the class materials. Included in these materials was a copy of Og Mandino's book, *The Greatest Salesman in the World.* Smouse read two paragraphs to Grant and the others in the class and asked them to memorize these paragraphs. He also asked them to recite the passage morning, noon, and night. Grant, however, found some of the ideas in the two paragraphs antithetical to her religious beliefs and refused to read more of the book because she felt Smouse was asking her to replace her religious beliefs with the ideas espoused in the book.

On the second day of class, Grant expressed her problems with the book to Smouse, telling Smouse that she could not read the book. When Smouse informed her that she had to read the book to complete the class, she told Smouse that it was against her beliefs as a Christian to read the book. Smouse then dismissed Grant from the class.

Grant went home and called Jerry Rocco, a sales manager at Joe Myers. She informed Rocco of the problems she was experiencing in Smouse's class. She also informed him that she was a Christian and the required book "was against everything she believed as a Christian." Rocco informed her that she would have to read the book if she wanted to take the class and must take the class to be hired.

Grant did not return to the class and was not hired. She subsequently filed a claim against Joe Myers with the Equal

Employment Opportunities Commission (EEOC) and the Texas Commission on Human Rights and, after exhausting her administrative remedies, instituted this suit alleging religious discrimination, retaliatory discharge, and intentional infliction of emotional distress.

After Grant's deposition had been taken and other discovery conducted, Joe Myers filed a no-evidence motion for summary judgment. The trial court granted this motion, and Grant appealed addressing only the issue of religious discrimination.

### STANDARD OF REVIEW

When reviewing a no-evidence summary judgment, we apply the same legal sufficiency standard that we apply in reviewing a directed verdict. *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex. App.-San Antonio 1998, pet. denied); Judge David Hittner & Lynne Liberato, *No–Evidence Summary Judgments Under the New Rule*, in STATE BAR OF TEXAS PROF. DEV. PROGRAM, 20 ADVANCED CIVIL TRIAL COURSE D, D–5 (1997). We look at the proof in the light most favorable to the non-movant, disregarding all contrary proof and inferences. *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997), cert. denied, 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998); *Lampasas v. Spring Center, Inc.*, 988 S.W.2d 428, 432 (Tex.App.-Houston [14th Dist.] 1999, no pet.). A trial court cannot grant a no-evidence summary judgment if the respondent brings forth more than a scintilla of proof to raise a genuine issue of material fact. *Moore*, 981 S.W.2d at 269; TEX.R. CIV. P. 166a(i). Proof that is so weak that it only creates a mere surmise or suspicion of a fact is less than a

scintilla. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). On the other hand, when the proof "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions," the respondent has provided more than a scintilla of proof and survives summary judgment. *See Havner*, 953 S.W.2d at 711.

### RELIGIOUS ACCOMMODATION UNDER THE TCHRA

Although the issue is not raised by either party, it is important to note that the Texas Commission on Human Rights Act allows both employees and job applicants to bring claims under the Act. The TCHRA states that an employer commits an unlawful act when the employer "fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual" on the basis of "race, color disability, religion, sex, national origin or age." TEX. LABOR CODE ANN. § 21.051(a) (Vernon 1996).[1] The TCHRA, therefore, applies not only to employees, but job applicants as well. Here, even though Grant had not been hired by Joe Myers at the time she alleges employment discrimination occurred, the company could not discriminate against her on the basis of her religion under the statute since she had applied for a job with the company.

In this case, Grant alleged accommodation-type religious discrimination. Under both Title VII and the TCHRA, employers must accommodate religious beliefs once they are informed of them. 42 U.S.C. § 2000e(j) (1994); TEX. LABOR CODE ANN. § 21.108 (Vernon 1996). Under Title VII, an employee establishes a prima facie religious accommodation case by showing

1. The entire provision of the statute prohibiting employment discrimination states:

   "An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:

   (1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in

   connection with compensation or the terms, conditions, or privileges of employment; or

   (2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee." TEX. LABOR CODE ANN. § 21.051

that: (1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; and (3) he or she suffered an adverse consequence for failure to comply with the conflicting employment requirement. *See Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 73, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986); *see also Turpen v. Missouri–Kansas–Texas R.R. Co.,* 736 F.2d 1022 (5 th Cir.1984). Once this is established, the burden then shifts to the employer to show that it could not accommodate the plaintiff's religious beliefs without undue hardship. *Id.*

■■■ Due to the dearth of case law interpreting the TCHRA, the Texas Supreme Court has directed Texas courts to seek guidance from federal interpretations of Title VII when construing the TCHRA. *See Speer v. Presbyterian Children's Home & Serv. Agency,* 847 S.W.2d 227, 232 (Tex.1993). Thus, we find that a plaintiff seeking to bring a religious accommodation case under the TCHRA must establish a prima facie case by establishing the same elements required under the federal test. In cases where a no-evidence summary judgment is filed against a plaintiff, the plaintiff must provide more than a scintilla of proof for each of the three elements of her case to survive summary judgment.

Here, Joe Myers challenged Grant's ability to provide proof of any of the elements of her prima facie case. Since the trial court granted Joe Myer's motion in a general order, we must analyze the proof offered by Grant on each element to see if she has offered more than a scintilla of proof for each element of her case. Because we find that Grant has provided more than a scintilla of proof on all elements of her prima facie case, we reverse the judgment of the trial court.

### Bona Fide Religious Belief

■■ Joe Myers asserts on appeal that Grant has failed to provide proof that she has a bona fide religious belief. The term "religion" is not defined in the TCHRA or Title VII, so it is appropriate to look to federal regulations to discern the meaning of this term. *See Norwood v. Litwin Eng'r & Constr., Inc.,* 962 S.W.2d 220 (Tex.App.-Houston [1 st Dist.] 1998, pet. denied).

The EEOC, in defining "religion" under Title VII, states that religious beliefs are "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." EEOC Guidelines, 29 C.F.R. 1605 (1985). The EEOC has also stated that the protections of Title VII extend not only to traditional religious beliefs, but to moral and ethical beliefs as well. 45 Fed. Reg. at 72,611 (1980) (citing the analysis applied by the Supreme Court in *U.S. v. Seeger,* 380 U.S. 163, 85 S.Ct. 850 (1964), and *Welsh v. U.S.,* 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970)). Even if the religious group to which the individual claims membership does not accept or follow the beliefs propounded by the individual, this fact is not determinative of whether or not those religious beliefs are worthy of protection. 29 C.F.R. 1605.1 (1985). We believe the same logic is applicable here.

Joe Myers argues in its brief that Grant fails to prove a bona fide religious belief because she was unable to provide specific tenets of Evangelical Christianity that the reading of the book violated. We disagree with this argument.

Grant stated that the requirement that she read these particular paragraphs three times a day, once in the morning, once at noon, and once at night, conflicted with her prayers and Bible reading at those times. She also claimed that she believed the required actions intimated that the ideas asserted in the paragraphs take the place of her religious beliefs. She asserted to Joe Myers that reading this book violated her beliefs as a Christian. We find the proof presented in this regard more than a scintilla of evidence that Grant held a bona fide religious belief.

Joe Myers also argues that Grant failed to show that reading the book was an employment requirement. Grant, however, states in her deposition that she was told by Jerry Rocco that she was required to take the class before she would be considered for employment by Joe Myers. This testimony provides more than a scintilla of evidence that reading the book and performing the other actions requested by Smouse were required before Grant could be employed by Joe Myers.

### NOTIFICATION OF BELIEF, CONFLICT, AND NEED FOR ACCOMMODATION

■ Grant was also required to show that she informed Joe Myers that the employment requirement conflicted with her religious beliefs and she needed an accommodation.

In support of this element, Grant points to her deposition where she discusses her call to Joe Myers after being removed from the training class. In her deposition, Grant testified that she called Jerry Rocco at Joe Myers the same day that she was removed from the training class. She informed him of what had happened and told him that the book Smouse required her to read was against her Christian beliefs. She also asked that Joe Myers provide on-the-job training or some other alternative to taking Smouse's class. Based on this testimony, Grant contends that she has presented more than a scintilla of proof on this issue. We agree.

### ADVERSE CONSEQUENCE

■ Finally, Grant presented proof that she was not hired because she refused to complete the training course. Joe Myers does not contest that Grant suffered an adverse consequence for failing to complete the class. An employer's failure to hire a job applicant based on the applicant's religious beliefs is an adverse consequence cognizable under Title VII. *See Philbrook*, 479 U.S. at 73, 107 S.Ct. 367 (stating that a refusal to hire is actionable under Title VII in a religious accommoda-

tion context); *see, e.g., E.E.O.C. v. READS, Inc.*, 759 F.Supp. 1150 (E.D.Penn.1991) (recognizing a refusal to hire an applicant based on her religious beliefs is an adverse consequence actionable under Title VII). Applying this reasoning to the TCHRA, we find more than a scintilla of proof on this element of Grant's case.

Since Grant has provided more than a scintilla of proof on each element of her prima facie case of employment discrimination, we find the trial court erroneously granted Joe Myers' no-evidence summary judgment on that issue. Therefore, we reverse the judgment of the trial court as it pertains to Grant's religious discrimination claim and remand the case for further proceedings. However, since Grant does not contest the propriety of the summary judgment on the issues of retaliatory discharge and intentional infliction of emotional distress, we affirm the judgment of the trial court on those issues.

J. HARVEY HUDSON, Justice, concurring.

I join the majority opinion in all respects and write separately only to further address the contention raised by Joe Myers Toyota that Grant failed to show she has a bona fide religious belief which reasonably conflicts with the required sales training.

As part of the Automotive Sales Training class, Grant was required to read Og Mandino's book, *The Greatest Salesman in the World.* A fictional tale set in New Testament times, the book recounts how Hafid, the servant of a wealthy Middle East merchant, aspired to be "the greatest merchant, the wealthiest man, and the greatest salesman in all the world." While on a business trip to Bethlehem, Hafid donates a valuable robe to a young woman and her newborn infant child who have taken refuge from the cold in the stables outside his inn. Shortly thereafter, Hafid is given a mysterious set of ten scrolls

containing the secrets of life and the principles of how to become a great salesman.

Incorporating the principles and teachings of the ten scrolls, Hafid becomes immensely wealthy. At the end of a rich and successful life, Hafid encounters Paul, the apostle of Christ. Paul is depressed and frustrated. He relates that he has tried for four years to communicate the gospel of Jesus Christ to the world, but all of his efforts have ended in failure. Hafid then delivers the secret scrolls to Paul. Incorporating the teachings of the scrolls, Paul then becomes the greatest salesman in all the world.

The ten scrolls are set forth in the book. After reading the first scroll, Grant concluded that Mandino's teachings were contrary to her beliefs as a Christian, and she refused to read the remainder of the book. Joe Myers Toyota argues that Grant failed to articulate how the tenets of her Christian faith are in conflict with Mandino's teachings. In its brief, Joe Myers Toyota states that Mandino is an ordained minister and that if Grant had finished reading his book she would not have been offended because the book simply teaches "the values of charity, love, dedication and faithfulness—all true Christian values." Thus, we are invited to compare Mandino's book with the doctrines of the Christian faith and decide whether they are in conflict.

It is the role of theologians, not courts, to define the accepted tenets of a particular faith.[1] In determining whether a person holds a "bona fide religious belief," the test is not whether his or her beliefs fit within the "accepted" parameters of a particular religious faith because to do so would be tantamount to "establishing" an approved religion.[2] Rather, the question before the court should be whether the religious belief is "bona fide" in the sense that it is *truly* a deeply held religious conviction of the person under inquiry, not whether it comports with the doctrines of a recognized religious faith.[3]

While it is the plaintiff's burden to establish that he or she possesses a bona fide religious belief that conflicts with his employment duties, this is not a particularly difficult task.[4] Here, Ms. Grant described herself as an "evangelical Christian."

Broadly speaking, "evangelical" is a term used to describe all Protestants who follow a traditional, often conservative doctrine.[5] Thus, the term "evangelical Christian" has general reference "to a broad group of believers who (1) have had a

---

**1.** *See Fowler v. Rhode Island,* 345 U.S. 67, 70, 73 S.Ct. 526, 97 L.Ed. 828 (1953) (holding that it is "no business of courts to say ... what is a religious practice or activity," because it "is merely an indirect way of preferring one religion over another"). However, the fact that a particular belief is shared by others of the same faith or sect may provide some evidence that it represents the true belief of the person asserting it.

**2.** *See Heller v. EBB Auto Co.,* 8 F.3d 1433, 1437 (9th Cir.1981); U.S. CONST. amend. I ("Congress shall make no law respecting an establishment of religion").

**3.** *See International Society for Krishna Consciousness, Inc. v. Barber,* 650 F.2d 430, 441 (2nd Cir.1981) (holding that "those beliefs which are held as a matter of conscience" are protected, and that any inquiry involving the verity of the underlying belief is "forbidden"). *See also Sutton v. Providence St. Joseph Medical Center,* 192 F.3d 826, 830 (9th Cir.1999)

(noting that the employee had proven he "had a bona fide religious belief, the practice of which conflicted with an employment duty" because it was "uncontested that [he] *sincerely believes* that his religion prevents him from providing a social security number") (emphasis added); Barbara L. Kramer, *Reconciling Religious Rights and* Responsibilities, 30 LOY. U. CHI. L.J. 439, 448 (1999).

**4.** *See Philbrook v. Ansonia Board of Education,* 757 F.2d 476, 481 (2nd Cir.1985), aff'd, 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986). *See also Chalmers v. Tulon Company of Richmond,* 101 F.3d 1012, 1019 (4th Cir.1996) (holding that a plaintiff establishes the existence of a bona fide religious belief by merely alleging it if the employer offers no evidence to the contrary).

**5.** Jonathan Turley, *Laying Hands on Religious Racketeers: Applying Civil RICO to Fraudulent Religious Solicitation,* 29 WM. AND MARY L. REV. 441, 459 (1988).

born-again (conversion) experience resulting in a personal relationship with Jesus Christ; (2) accept the full authority of the Bible in matters of faith and the conduct of everyday life; and (3) are committed to spreading the gospel by bearing public witness to their faith." [6]  They are orthodox in their beliefs and embrace the fundamentals of the Christian faith; [7] they "will not accept any theological claim that abandons classic Christian beliefs about the person of Jesus: his messiahship, incarnation, bodily resurrection, or divinity." [8]

Grant's objection to the training course was not merely reading the book—the students were also required to assimilate the teachings of the scrolls into their minds and thereby change their attitudes and outlook on life.  The scrolls are filled with religious imagery and teach that through the power of positive thinking, one can be "born again" by becoming a slave to good habits.  These habits are cultivated by reading aloud the teachings of the scrolls three times a day—"when I arise," "after I have partaken of my midday meal," and "just before I retire at day's end."  Each scroll is to be read in this manner for thirty days.  The pupil is to recite and confirm in his memory self-affirming thoughts such as—"I am nature's greatest miracle"; "I will be the master of my emotions"; "I control my destiny, and my destiny is to become the greatest salesman in the world"; and "I will multiply my value a hundredfold."  The tenth scroll concludes with a prayer which is to be offered to the "creator of all things" in which the pupil again expresses his or her desire for good habits and success.

Grant perceived the ritualistic readings and oral chanting as a form of prayer. She was uncomfortable with the practice and refused to participate.  She also objected to specific teachings contained in the first scroll, namely: (1) "bad habits" are the source of failure; (2) "good habits" are the key to all success; and (3) the first law to be obeyed above all others is to become the "slave of good habits."  Citing specific verses of scripture in support of her beliefs, Grant said: (1) sin, not bad habits, is the door to failure; (2) Jesus Christ, not good habits, is "the way, the truth and the light"; (3) and that as a Christian, she was obliged to love the Lord her God and to have no other gods before Him. She stated that she believed the course was attempting "to change my mind about my belief in Christ."

Grant also objected to teachings regarding the autonomy of man.  Dick Smouse, an ordained minister and the course instructor, allegedly told the class they were gods. [9]  Grant took issue with this teaching:

> ... he asked us to look at an overhead light similar to this one.  And he said that man created that light, that we were gods and we had the power and the ability to create and the fact—to prove it was, that we had created this light.  I said, "No, we didn't create this light."  And he said, "Well, we sure did."  And then he says, "Wait a minute.  Wait a minute."  He said, "Who in my class is a Christian?"  And I raised my hand.  And I think a couple of others did....  Then he said, "Who in my class is a

6.  *See* Mark A. Shibley, *Americans and Religions in the Twenty–First Century: Contemporary Evangelicals: Born–Again and World Affirming*, 558 ANNALS 67, 69 (1998) (The Annals of The American Academy of Political and Social Science).

7.  Ms. Grant testified that she believes the Bible is the true word of God, that Jesus Christ is the Son of God, and that in September of 1973, her past deeds were forgiven when she came into a personal relationship with Jesus Christ.

8.  David P. Gushee, *The Holocaust: Remembering for the Future*, 548 ANNALS 138, 142 (1996).

9.  A common characteristic of "new age" training programs is that students are told they are deities equal to God. *See* Charles E. Mitchell, *New Age Training Programs: In Violation of Religious Discrimination Laws?*, 41 LAB. L.J. 410, 411 (1990).

*strong* Christian?" And my hand went back up. He says, "Well, Christians are flaky, irresponsible and undependable." And I said, "Mr. Smouse, that's not true because I'm a Christian and I'm not any of those."

(Emphasis added). The following day, Ms. Grant again articulated her objections to the teaching:

... when class began, I said, "Mr. Smouse," I said, "remember yesterday when you said that we created this light?"

He said, "Yes, we created it."

I said, "No, we invented it. Man invented it but God gave man the wisdom to do that because we're not God, we didn't create anything."

And he said, "Well, I say we created it."

And then I said, "Mr. Smouse, may I say something?"

And he said yes.

I said, "I cannot read this book." And I said, "I just can't. It goes against everything I believe as a Christian. I cannot read this scroll. I cannot read it in the morning, at noon, at night. I can't say it aloud. I just can't. I said, "Is there any way that I can continue this class?"

He said, "That's part of the class. You have to read it." I said [I] can't. He said, "Mrs. Grant, you're dismissed."

If Grant's account of the class is accurate, the Automotive Sales Training course required by Joe Myers Toyota contrasts sharply with her Christian beliefs. In fact, the instructor allegedly acknowledged his hostility toward traditional Christian doctrine.

By some estimates, evangelicals comprise between one-fifth to one-fourth of the American population.[10] In addition, adherents of orthodox Judaism or Islam would also likely find it impossible to participate in the course for many of the same reasons articulated by Ms. Grant. "New age" training programs have been highly controversial for more than a decade.[11] It should have been anticipated that at least some persons would not be able to participate in the Automotive Sales Training class due to bona fide religious convictions, yet no reasonable accommodation was planned, made, or offered by Joe Myers Toyota.

Grant offered sufficient proof that she possessed bona fide religious beliefs which conflicted with the required training class; thus, the trial court erred in granting Joe Myers Toyota's motion for summary judgment. With these observations, I join the majority opinion in all respects.

---

**10.** Stephen Bloch, *Cumulative Voting and the Religious Right: In the Best Interest of Democracy?*, 24 J. Contemp. L. 1, 20 (1998).

**11.** *See* Mitchell, *New Age Training Programs, supra* at 410–11 (1990).