**Frank MILLER, Appellant,**

v.

**SAFEWAY, INC. and Mick
Galic, Appellees.**

No. S–11101.

Supreme Court of Alaska.

Nov. 26, 2004.

Rehearing Denied Dec. 30, 2004.

John E. Havelock, Law Offices of John E. Havelock, Anchorage, for Appellant.

Cynthia L. Ducey, Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc., Anchorage, for Appellees.

Before: BRYNER, Chief Justice, MATTHEWS, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

Frank Miller is an Alaska Native who was terminated from his employment at Safeway after he refused to cut his hair in accordance with a corporate grooming policy. He sued on the grounds that the policy discriminated on the basis of race, religion, and gender, and that it violated his right to privacy. Miller subsequently moved to amend his complaint

to add claims of breach of the implied covenant of good faith and fair dealing, wrongful discharge, and common law privacy. The superior court denied as untimely Miller's request to amend his complaint and granted Safeway's motion for summary judgment, dismissing the case.

Because we conclude that state action is required for Miller's constitutional privacy cause of action, we affirm the trial court's ruling dismissing Miller's constitutional claim for lack of state action. We also affirm the superior court's rulings that Miller failed to demonstrate discrimination on the basis of race, sex, or religion. Miller failed to present evidence that the hair length policy was discriminatory or that he was treated less favorably than similarly qualified employees on the basis of race or gender, and he failed to provide notice to his employer that his religious beliefs and practices conflicted with Safeway's hair length policy. But because the trial court must freely grant leave to amend a complaint, and no prejudice would have resulted to Safeway in light of the trial court's decision to vacate the trial date and reopen discovery on certain issues, we reverse the trial court's denial of Miller's motion to amend his complaint and remand for a determination whether Safeway breached the implied covenant of good faith and fair dealing or wrongfully terminated Miller.

## II. FACTS AND PROCEEDINGS

### A. Facts

Frank Miller is an Athabascan Indian and a member of the Kenaitze tribe. Miller holds shares in Kenai Native Association, Inc. and Cook Inlet Region, Inc., and is an Alaska Native under federal law. Miller has worn his hair shoulder length or longer all his life, with the exception of the period of time he served in the United States Navy between 1961 and 1966. In an affidavit, Miller explained his reasons for growing long hair: "I personally like to have my hair long and feel it is an expression of my natural personality, my spirituality and my ties with Alaska Native tradition." Miller maintains that his mother, who was also Athabascan, raised Miller's awareness of his Native culture and tradition and passed down to him the Native practice of growing hair long.

On July 29, 1998, Miller was hired to work as a sales clerk for a Carrs supermarket in the Oaken Keg, the section of the store that markets liquor. Miller indicates that the Oaken Keg knew that he was an Alaska Native due to his appearance and his statement that he is "American Indian/Alaskan Native" on employee ethnicity records gathered by Safeway in August 1998. The store manager who hired Miller informed him that he would be allowed to keep his hair long so long as he kept it tied back, notwithstanding the printed dress code for Carrs employees. The dress code policy recites, under a section entitled "General Appearances":

> Well groomed and conservatively styled hair.
>
> a. Men's hair: No longer than collar length. No beards.
>
> Mustaches acceptable if neatly groomed and not curved over lower lip. Sideburns should not extend below the ear lobe.
>
> b. Women's hair: Neatly styled.

The introduction to the Oaken Keg policies also included the following statement regarding Miller's terms of employment:

> When you begin with the Oaken Keg, you will be on a probationary status. At the end of (90) days, upon successful completion of the probationary period, you will become a permanent employee.

Miller was not advised that he was in violation of the dress code or that he must cut his hair until February of 2001, more than two years and seven months after he was hired. Joe Price, Miller's supervisor, did not initially make any comments to Miller regarding hair length. Safeway purchased Carrs in April 1999, and Miller attended a Safeway orientation in June 1999 in which the Safeway dress code policy for male employees reiterated the previous Carrs policy that the hair length of male employees "should not exceed the collar-line." Although Miller's hair was noticeably long and fell below the collar line, none of the supervisors or trainers at the orientation directed any comments to Miller concerning his hair. Sometime after the orientation, Miller and Price had a conversation in

which Miller recalls that Price remarked, "unless they say something to me, you are not required to get a haircut."

In January 2001, a year and a half after Safeway acquired Carrs, Miller learned that the Oaken Keg store where he worked was scheduled to close the next month. In late January 2001 all store employees, including Miller, were informed by letter or memorandum that they would have a job in either the Soldotna or Kenai Carrs stores. Miller states that he expected that he would be transferred to one of these other stores. According to Miller, he received regular job evaluations in which his performance was judged good to excellent in every respect.

Close to a week before the store closed, Price informed Miller that, according to Safeway manager Mick Galic, if Miller wanted to transfer to another store he would have to cut his hair. Miller told Price that he would not cut his hair. As a result, Safeway terminated Miller.

## B. Procedural History

Miller filed a class action complaint on June 8, 2001. The complaint alleged violations of his constitutional rights to privacy and freedom of speech. The complaint also alleged discrimination based on creed and religion in violation of the Alaska Constitution, as well as statutory claims under AS 18.80.220 and AS 22.10.020 for discrimination based on race, color, national origin, religion, and gender. Miller stated his action as a class action on behalf of past and present employees and persons who had been terminated or rejected by Carrs or refused employment due to the policies "herein complained of."

Superior Court Judge John Reese presided over the case. The parties agreed at their pre-conference planning meeting on October 15, 2001 that they would be ready for trial by April 2003. The three dates for trial requested in the order of preference were: May 12, 2003, April 27, 2003, and April 21, 2003. Miller's counsel was unable to attend

the pretrial scheduling conference that took place on October 16, 2001, and the trial date selected at the scheduling conference was July 22, 2002, eight months from the date of the conference.[1] Miller's counsel asserts that he assumed that the pretrial scheduling order issued on November 16, 2001 would roughly correspond to what he had agreed to at the pre-conference planning meeting, and that he did not notice the accelerated trial date and discovery schedule until mid-January 2002.

On January 25, 2002, Miller filed a motion to amend the pretrial order to reset the trial date for the originally requested time in April 2003. Safeway opposed the motion, arguing that Miller's request was unreasonable because Miller had not adequately participated in discovery or taken the procedural steps necessary to pursue a proper class action. Judge Reese issued an order ruling that it did not appear that Miller was diligently pursuing the class action part of the claim, but that if Miller did have a valid class action, the July 22, 2002 trial date was too soon. Judge Reese therefore scheduled a status hearing for April 22, 2002 to review the progress of the preparation of Miller's case. Safeway asserts that although the trial court decided to hold a status conference it did not vacate or modify discovery deadlines.

On April 18, 2002, Safeway moved for summary judgment, seeking dismissal of Miller's case in its entirety. On May 1, 2002, Miller filed a motion for extension of time to oppose the summary judgment asserting three grounds: (1) Safeway's failure to respond adequately to discovery; (2) the need for more extensive discovery; and (3) Miller's intent to amend his complaint to include wrongful termination, breach of the implied covenant of good faith and fair dealing, and invasion of privacy.

Nine days later, on May 10, 2002, Miller filed a motion to amend his complaint to add three causes of action: breach of the covenant of good faith and fair dealing, wrongful discharge, and common law invasion of priva-

1. Counsel for Safeway asserts that when she arrived at the scheduling conference, she learned that Miller's counsel would not be attending the meeting, but that he had given his consent to

proceed with the conference. She asserted in an affidavit that "based on that confirmation and my availability, one of the dates proffered by the judge, [July 22, 2002], was selected."

cy. Miller asserted that Safeway would not be prejudiced by his late filing because the new claims were based on the previously pleaded facts. On May 30, 2002, Safeway opposed the motion to amend asserting undue delay, prejudice, and futility of the amendment. Miller's motion to amend was not ruled upon until the following January 2003, when the trial court denied the motion to amend "as not timely."

Over six months prior to that ruling, on May 20, 2002, Judge Reese presided over the status hearing, originally scheduled for April 22, to review the progress of the case and to determine whether to vacate the scheduled trial date of July 22, 2002. The trial court decided to vacate the trial date and set a new trial schedule once the court had resolved the summary judgment motion. The trial court also noted that although discovery was officially closed, pending discovery could be completed, as well as any additional discovery necessary to oppose summary judgment.

On June 28, 2002, Miller filed a motion to compel responses to the requests for production, interrogatories, and requests for admissions. Miller filed his opposition to Safeway's summary judgment motion and cross-motion for partial summary judgment on December 23, 2002, before the trial judge issued an order on the motion to compel. The superior court did not issue an order on the motion to compel until January 7, 2003, when it ultimately denied the motion, ruling that only discovery relevant to the summary judgment opposition was allowed.

In his opposition to summary judgment, Miller included a supplemental affidavit in which he expanded upon his cultural upbringing in an Athabascan village, his spiritual beliefs, and Safeway's knowledge of his Alaska Native background. The trial court struck this affidavit from the record, ruling that the "[r]elevance of the affidavit is questionable, and the religion/hair length issues are subsequent, inappropriate modifications of [Miller's] prior deposition testimony."

On March 10, 2003, Judge Reese granted Safeway's motion for summary judgment in its entirety and denied Miller's cross-motion for summary judgment. The trial court concluded that: (1) the constitutional claims failed because Safeway was a private actor and state action was required; (2) there was no evidence that Safeway intended to discriminate on the basis of race or that the hair length policy had a disparate impact on race; (3) the religious discrimination claim failed because Miller failed to notify Safeway that the hair length policy conflicted with his religious or spiritual beliefs; and (4) the hair length policy did not constitute unlawful gender discrimination. The superior court dismissed the action before ruling on Miller's motion to certify the class, rendering Miller's class certification motion moot.

Miller appeals these rulings arguing that: (1) state action is not a necessary prerequisite for a constitutional claim under the privacy amendment of the Alaska Constitution; (2) he presented a prima facie case raising an inference of an intent to discriminate; and sufficient evidence that Alaska Natives are disparately impacted by Safeway's hair length policy; (3) Safeway did have notice that its hair length policy conflicted with Miller's spiritual beliefs; (4) the hair length policy constituted unlawful employment discrimination under AS 18.80.220; (5) the trial court erred when it denied Miller's motion to amend his complaint; (6) the trial court should have granted Miller's motion to certify the class; and (7) the trial court should have considered Miller's supplemental affidavit.

## III. DISCUSSION

We have previously recognized in *Breese v. Smith*[2] that hairstyles are a deeply personal expression of individual identity and a reflection of diversity in a pluralistic society. In *Breese*, we held that students attending public schools have "a constitutional right to wear their hair in accordance with their personal tastes."[3] Unlike *Breese*, the present case involves constitutional and statutory claims against a private actor in its capacity as an employer. In *Luedtke v. Nabors Alas-*

**2.** 501 P.2d 159 (Alaska 1972).

**3.** *Id.* at 168.

ka Drilling, Inc.,[4] we declined to extend the constitutional right to privacy to the actions of private actors because the parties failed to present a history of the privacy amendment[5] demonstrating an intent to bar private action. In this case, Miller asks us to reconsider our decision in Luedtke, arguing that he has uncovered legislative history of the amendment that proves an intent to proscribe private action.

Although we have not previously recognized constitutional privacy claims against private employers, we have firmly established that conduct such as discrimination by a private employer constitutes an unlawful employment practice under Alaska law.[6] Miller asserts that Safeway discriminated against him in violation of AS 18.80.220 on the basis of race, religion, and sex when it terminated his employment.[7]

The causes of action for wrongful termination and breach of the implied covenant of good faith and fair dealing provide additional safeguards against employment practices that violate substantial and fundamental public policies. Miller's motion to amend his complaint to add these claims was denied by the trial court as "untimely." We must therefore consider whether Alaska Civil Rule 15's mandate that leave to amend "shall be freely given when justice so requires"[8] required the trial court to grant Miller's motion to amend his complaint. In deciding this question, we must balance the possible preju-

dice to Safeway in defending these claims with the potential harm caused to Miller if he is precluded from litigating these issues. We will review each of these questions in turn.

### A. Standard of Review

 We review a grant of summary judgment using our independent judgment.[9] We "must determine whether any genuine issue of material fact exists and whether the moving party is entitled to judgment on the law applicable to the established facts. All reasonable inferences of fact from proffered materials must be drawn against the moving party and in favor of the non-moving party."[10] A trial court's decision regarding the admissibility of evidence, including expert testimony, is generally reviewed for abuse of discretion, but when admissibility turns on a question of law, we apply our independent judgment.[11] The superior court's denial of a motion to amend a complaint is reviewed for abuse of discretion.[12]

### B. State Action Is Required To Pursue a Cause of Action Under the Privacy Amendment, Alaska Constitution, Article I, Section 22.

 We have long recognized that the primary purpose of the constitutional right to privacy[13] is to protect the personal privacy of individuals from unwarranted intrusions by the government.[14] In Luedtke, we declined to extend the constitutional right to privacy

---

4. 768 P.2d 1123, 1130 (Alaska 1989).

5. Alaska Const. art. I, § 22.

6. Raad v. Alaska State Comm'n for Human Rights, 86 P.3d 899 (Alaska 2004); Wondzell v. Alaska Wood Prods., Inc., 601 P.2d 584, 585 (Alaska 1979); AS 18.80.220.

7. Miller's complaint also alleged a violation of his free speech rights and discrimination on the basis of creed and religion in violation of the Alaska Constitution. Miller does not argue that the superior court erred in entering judgment on these claims.

8. Alaska R. Civ. P. 15(a).

9. Haroldsen v. Omni Enters., Inc., 901 P.2d 426, 430 n. 5 (Alaska 1995).

10. Id. (citing Wright v. State, 824 P.2d 718, 720 (Alaska 1992)).

11. Laidlaw Transit, Inc. v. Crouse, 53 P.3d 1093, 1097 (Alaska 2002).

12. Bauman v. Day, 942 P.2d 1130, 1132 (Alaska 1997).

13. The Alaska Constitution was amended in 1972 to add the following section: "Right of Privacy. The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement this section." Alaska Const. art. I, § 22.

14. State v. Planned Parenthood of Alaska, 35 P.3d 30, 38 (Alaska 2001); Luedtke, 768 P.2d at 1129 (quoting Woods & Rohde, Inc. v. State, Dep't of Labor, 565 P.2d 138, 148 (1977) (quoting Weltz v. State, 431 P.2d 502, 506 (Alaska 1967) (referring

to prohibit action by private parties after determining that the parties had not established that the history of article I, section 22 demonstrated an intent to proscribe private action.[15] We concluded:

> The parties in the case at bar have failed to produce evidence that Alaska's constitutional right to privacy was intended to operate as a bar to private action.... Absent a history demonstrating that the amendment was intended to proscribe private action, or a proscription of private action in the language of the amendment itself, we decline to extend the constitutional right to privacy to the actions of private parties.[16]

Miller claims that the parties and this court in *Luedtke* overlooked evidence demonstrating that the privacy amendment was intended to proscribe private action. Miller asserts that the initial Senate draft of the amendment evidenced an intent on the part of the legislature to reach private parties because it stated that the "legislature shall provide for the prosecution and punishment of public officials and private parties."[17] Miller further contends that our dicta in *State v. Planned Parenthood of Alaska*[18] suggests that the legislature did not abrogate this intent when it subsequently changed the phrasing of the amendment. In *Planned Parenthood,* we took note of the House Judiciary Committee's debate on the wording of the amendment, which originated as Senate Joint Resolution No. 68, after it was amended by the Senate and transmitted to the House. The resolution then stated:

> The right of the people to privacy is recognized and shall not be violated. The legislature shall provide for the prosecution and punishment of public officials and *private parties* who act in violation of this section,

and shall provide civil remedies to supplement common law remedies to redress and prevent such violations.[19]

(Emphasis added.)

According to the House Judiciary Committee minutes quoted in *Planned Parenthood,* the committee members engaged in the following discussion concerning the second sentence of the resolution that refers to violations of private parties:

> Representative Banfield moved to delete the second sentence. There was no objection. Art Peterson, committee counsel, said we could say "shall implement this section" or "shall provide for the implementation of this section" and leave out the details. This would be stating principles generally which allows for easier administration. [Representative] Barber felt that we were leaving out the penalty section. Moran said this would be covered in the "implementation."[20]

Miller asserts that while the House members altered the language of the amendment from the drafted wording "the legislature shall provide for the prosecution and punishment of public officials and private parties" to its ultimate formulation as "[t]he legislature shall implement this section,"[21] this change did not reflect a substantive decision that the amendment should no longer apply to private parties. Miller maintains that the legislature instead intended that the broader language, "the legislature shall implement this section," would encompass the previous view that the legislature could prosecute and punish both public and private action. Safeway refutes Miller's interpretation, arguing that to the extent language regarding private action was omitted from the final version of Section 22, we must presume that the legislature intended to change the meaning. More-

to article I, section 14 guarantees against unreasonable searches and seizures))).

15. 768 P.2d at 1130.

16. *Id.*

17. 1972 Senate Joint Resolution No. 68, 7th Leg., 2d Sess. (May 5, 1972). Miller also maintains that we uncovered a part of the legislative history in our dicta in *Valley Hosp. Ass'n, Inc. v. Mat–Su Coalition for Choice,* 948 P.2d 963, 969–70 (Alaska 1997) where we noted similar phras-

ing in the initial Senate draft of the amendment, Senate Joint Resolution No. 68.

18. 35 P.3d 30 (Alaska 2001).

19. *Id.* at 36.

20. *Id.* at 37 (quoting H. Jud. Comm. Minutes at 318–19, 7th Leg., 1st Sess. (May 30, 1972)) (original brackets and ellipsis omitted).

21. Alaska Const. art. I, § 22.

over, Safeway convincingly argues that the citizens who ratified the amendment voted on a version of Section 22 that did not contain any specific language regarding penalties for private action. Because we must look to the intent of Alaska's voters,[22] the "history" that Miller must produce exceeds the scope of merely legislative history. Miller must demonstrate that the voters of Alaska clearly intended that the privacy amendment should apply to both public and private action.

The privacy clause of the California Constitution has been construed to apply to private actions.[23] But as we pointed out in *Luedtke*, "the history surrounding the 1972 adoption of the privacy amendment by the voters of California evinces a clear intent that the clause applies to private as well as governmental action."[24] The California Supreme Court determined that election brochures which were published by the drafters of its amendment satisfied this requirement because they contained frequent references to the intrusive activities of businesses and explained that the amendment would provide an enforceable right of privacy against these business interests. These brochures provided sufficient proof to evince an intent on the part of the California voters to ratify a privacy amendment that would proscribe private action.[25] But Miller has failed to produce evidence that the voters who ratified Section 22 specifically intended that the privacy amendment should apply to private action. Thus, the superior court did not err in its determination that state action is required to assert a violation of a constitutional right to privacy.

## C. Miller Did Not Present Evidence Sufficient To Raise an Inference of Racial Discrimination Under AS 18.80.220(a)(1).

The Alaska Human Rights Act, AS 18.80.220, was modeled on federal law, thus making federal case law relevant to this court's interpretation of the statute.[26] But we have repeatedly articulated that AS 18.80.220 is intended to be more broadly interpreted than federal law to further the goal of eradicating discrimination.[27] We therefore review an employee's claims of race discrimination in light of federal Title VII case law, mindful of "the strong statement of purpose in enacting AS 18.80 and our legislature's intent to put as many teeth into the statute as possible."[28] Under Title VII and AS 18.80.220, an employee may bring both a disparate treatment[29] and a disparate impact claim of employment discrimination. Miller asserted both theories of discrimination.

### 1. Disparate treatment

We have determined, in accordance with the reasoning of the United States Supreme Court, that it is "usually impossible" for an employee to prove that the employer acted with discriminatory intent.[30] We therefore apply the three-part pretext analysis adopted by the United States Supreme

22. See, e.g., *Hickel v. Halford*, 872 P.2d 171, 177–81 (Alaska 1994) (construing term used in article IX, section 17(a) of Alaska Constitution by looking at language of provision, purpose of amendment, statement in support of amendment published in voter pamphlet, and language used in related statutory provisions).

23. *Luedtke*, 768 P.2d at 1130.

24. 768 P.2d at 1129–30 (citing *White v. Davis*, 13 Cal.3d 757, 120 Cal.Rptr. 94, 533 P.2d 222, 233–34 (1975)).

25. *White*, 120 Cal.Rptr. 94, 533 P.2d at 233–34; *Luedtke*, 768 P.2d at 1130.

26. *Era Aviation, Inc. v. Lindfors*, 17 P.3d 40, 43 (Alaska 2000); *Wondzell v. Alaska Wood Products, Inc.*, 601 P.2d 584, 585 (Alaska 1979) (citations omitted).

27. *Wondzell*, 601 P.2d at 585.

28. *Id.* at 585–86 (quoting *McLean v. State*, 583 P.2d 867, 869 (Alaska 1978) (internal quotations omitted)).

29. Miller can assert both an individual disparate treatment action as well as a systemic disparate treatment claim alleging a pattern and practice of discrimination. From the evidence presented, it appears that Miller is bringing an action based on individual disparate treatment and systemic disparate impact.

30. *Haroldsen*, 901 P.2d at 431; *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes.").

Court when the employee is unable to provide such direct evidence.[31] Under this three-part analysis, the employee carries the initial burden of establishing a prima facie case of racial discrimination.[32] The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason why the employee was discharged.[33] The final stage of the test shifts the burden back to the employee to show that the employer's stated reason for the discharge was in fact pretext.[34] The pretext analysis can assist the jury in deciding whether the termination was based upon prohibited discrimination or upon legitimate factors.[35]

■ To establish that Safeway terminated him with intent to discriminate, Miller must first satisfy the threshold requirement of demonstrating a prima facie case by a preponderance of the evidence.[36] Miller must show that: (1) he is a member of a protected class under the statute; (2) he was qualified for the position; (3) he suffered adverse employment action, despite these qualifications; and (4) the employer treated him less favorably than other qualified persons.[37]

■ The trial court did not apply this four-part analysis, but it did make a factual finding that Miller is half Athabascan. For the purpose of this argument we will assume that Miller presented sufficient evidence that he is a member of a protected racial group.

But on the remaining elements, Miller's hair length did not comport with Safeway's grooming qualifications which require that male employees should not allow their hair to fall below the collar line. Miller was allowed an exemption from this qualification for over two and a half years, and then was terminated for failing to abide by the policy. Although the retraction of this apparent waiver may have occurred under circumstances that were wrongful or which breached an implied covenant of good faith and fair dealing, as we discuss below, Miller does not present evidence that he was treated less favorably than non-Native male employees with long hair.

## 2. Disparate impact

■ We have held that an expansive application of the disparate impact theory comports with the strong purposes behind AS 18.80.220.[38] In *Thomas v. Anchorage Telephone Utility*, we adopted an analysis for disparate impact claims similar to the one enunciated by the United States Supreme Court.[39] In order to present a prima facie case of discrimination, an employee must show "that a facially neutral employment act, practice, or policy has a significant discriminatory impact on a protected group."[40] If the employee proves discriminatory impact, the employer has the burden of proving that its actions are justified by business necessity or job-relatedness.[41]

31. *Raad v. Alaska State Comm'n for Human Rights*, 86 P.3d 899, 904 (Alaska 2004) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *Haroldsen*, 901 P.2d 426 at 430.

32. *Raad*, 86 P.3d at 904.

33. *Id.*

34. *Id.*

35. *Era Aviation*, 17 P.3d at 44.

36. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

37. *Haroldsen*, 901 P.2d at 430; *Era Aviation*, 17 P.3d at 44 n. 10 (citing *McDonnell Douglas*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668). We adopted the *McDonnell Douglas* prima facie test for disparate treatment employment discrimination cases in *Alaska State Comm'n for Human*

*Rights v. Yellow Cab*, 611 P.2d 487 (Alaska 1980). The Supreme Court noted in *McDonnell Douglas* that the prima facie standard is not inflexible, as "[t]he facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required from respondent is not necessarily applicable in every respect in differing factual situations." 411 U.S. at 802, n. 13.

38. *Thomas v. Anchorage Telephone Util.*, 741 P.2d 618, 629 (Alaska 1987).

39. *Id.* at 628.

40. *Id.* (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 349, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)).

41. *Id.* (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)).

Miller has not presented any studies, research, or testimony to prove that Alaska Native males are disparately impacted by Safeway's hair length requirement. His attempt to make a prima facie case is confined to the analysis that "[w]ith respect to disparate impact [Safeway's knowledge and responsibility] is icing on the cake." Miller relies on folklore and literary texts and he makes no effort to synthesize information to demonstrate a palpable theory that Alaska Natives are disparately impacted by Safeway's policies. Due to the inadequacy of evidence we need not decide whether a grooming policy pertaining to hair length would amount to impermissible discrimination if it were shown to have a disproportionate impact on Alaska Native males.[42]

### D. Miller Did Not Establish a Prima Facie Case of Religious Discrimination under 18.80.220(a)(1).

Miller also contends that Safeway discriminated against him when it terminated him for expressing his religious beliefs through his hairstyle. To assess whether an employee has established a prima facie case of religious discrimination we follow the approach employed by the Ninth Circuit in Title VII cases, as articulated in *Opuku–Boateng v. State of California.*[43] This approach requires the plaintiff to demonstrate that: (1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; and (3) he or she suffered an adverse consequence for failing to comply with the conflicting employment requirement.[44] Once these elements have been established, the burden then shifts to the employer to show that it could not accommodate the plaintiff's religious beliefs without undue hardship.[45] The plaintiff must provide more than a scintilla of proof for each of the three elements of his or her case to survive summary judgment.[46]

Turning to Miller's claim, he did present to the superior court an affidavit in which he described his long hair as an "expression" of his spirituality and his ties with Alaska Native tradition. The trial court correctly acknowledged that Miller met this first requirement. Miller's claim falters in the second part of the test which requires Miller to have informed his employer about his spiritual beliefs. Because Miller did not

---

**42.** Although we do not address this issue, we note that other jurisdictions have concluded that grooming policies do not disparately impact racial minorities under Title VII section 703. *See* Rogers v. American Airlines, Inc., 527 F.Supp. 229, 232 (S.D.N.Y.1981) ("An all-braided hair style is an 'easily changed characteristic,' and, even if socioculturally associated with a particular race or nationality, is not an impermissible basis for distinctions in the application of employment practices by an employer." (citation omitted)); *see also* Eatman v. United Parcel Serv., 194 F.Supp.2d 256, 262 (S.D.N.Y.2002). But these decisions have been criticized by several commentators. *See* Roberto J. Gonzalez, *Cultural Rights and the Immutability Requirement in Disparate Impact Doctrine*, 55 STAN. L.REV. 2195, 2215–16 (2003) (arguing that the "immutability requirement" for disparate impact adopted in *Rogers* is unsubstantiated because "[t]he landmark case that established the disparate impact theory, *Griggs v. Duke Power Co.*, found an employer liable for requiring applicants to have a high school diploma or pass an intelligence test.... [Requiring a diploma] in no way had to fall within the definition of race [as immutable] in order to trigger Title VII scrutiny."); *see also* Kenji Yoshino, *Covering*, 111 YALE L.J. 769, 781 (2002). (Yoshino writes that "the contemporary forms of discrimination to which racial minorities and women are most vulnerable often take the guise of enforced [assimilation]." A member of a racial minority can be sanctioned for failing to minimize the race-salient traits that make her different from others: "for wearing cornrows, for lapsing into Spanish, or for speaking with an accent."). *See generally* Barbara J. Flagg, *Subtle Opposition*, 34 COLUM. HUM. RTS. L.REV. 605, 608–09 (2003) (Flagg argues that coercive pressure on minorities to assimilate "would seem to fit comfortably within the disparate impact model of liability," but difficulties arise in practice if the workplace includes only small numbers of employees, if other non-whites are not adversely affected by the challenged policy because they elect to assimilate, if a court requires that a challenged practice must disparately affect the employer's own workplace, or if plaintiffs cannot provide proof of the criterion.).

**43.** 95 F.3d 1461 (9th Cir.1996).

**44.** *Grant v. Joe Myers Toyota, Inc.*, 11 S.W.3d 419, 422–23 (2000); *Opuku–Boateng*, 95 F.3d at 1467 n. 9; *Turpen v. Missouri–Kansas–Texas R.R. Co.*, 736 F.2d 1022, 1026 (5th Cir.1984).

**45.** *Grant*, 11 S.W.3d at 423.

**46.** *Id.*

give notice to Safeway regarding his religious beliefs or the fact that his hairstyle was tied to his spiritual beliefs, he has not satisfied the second requirement. We therefore affirm the superior court's grant of summary judgment on this issue.

**E. Safeway's Grooming Policy Did Not Constitute Gender Discrimination Under AS 18.80.220(a)(1).**

■ It is undisputed that Safeway's grooming policy established a hair length requirement for male employees but did not restrict the hair length of female employees. Under Title VII Section 703(e) an employer cannot discriminate on the basis of sex unless there is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business enterprise.[47] As Safeway asserts, however, many courts interpreting Title VII have held that it is not unlawful to institute a sex-based grooming policy that treats men and women differently.[48] In *Harper v. Blockbuster Entertainment Corp.*, the Eleventh Circuit noted that the Equal Employment Opportunity Commission initially took the opposing position, but finally "concluded that successful litigation of male hair length cases would be virtually impossible" in the face of the unanimity of the courts of appeal that considered the

issue.[49] These courts have generally found that grooming regulations have no significant effect on the employment opportunities of either sex, and that the length of an employee's hair more closely relates to the employer's choice of how to run a business than to equal employment opportunity.[50] Miller fails to cite authority from any jurisdiction holding that enforcing different hair length requirements for male and female employees is a discriminatory employment practice.

We agree with the reasoning of the numerous federal cases addressing this issue and conclude that Alaska law should not be more broadly construed in this particular respect. We conclude that Miller has not demonstrated that Safeway's hair grooming policy discriminated on the basis of gender.[51] We affirm the superior court's ruling on this issue.[52]

**F. The Trial Court Erred in Failing To Allow Miller To Amend His Complaint.**

■ In the absence of a motion filed on the eve of trial, "[l]eave to amend is liberally granted in Alaska,"[53] and we have long held that leave should freely be given unless "it would [result] in an injustice."[54] A "pro-amendment ethos dominates the intent

47. Title VII, § 703(e), 42 U.S.C.2000(e).

48. *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388–89 (11th Cir.1998); *Tavora v. New York Mercantile Exchange*, 101 F.3d 907, 908 (2d Cir.1996); *Longo v. Carlisle DeCoppet & Co.*, 537 F.2d 685, 685 (2d Cir.1976); *Earwood v. Cont'l Southeastern Lines, Inc.*, 539 F.2d 1349, 1351 (4th Cir.1976); *Barker v. Taft Broad. Co.*, 549 F.2d 400, 401 (6th Cir.1977); *Knott v. Missouri Pac. R.R. Co.*, 527 F.2d 1249, 1252 (8th Cir. 1975); *Baker v. California Land Title Co.*, 507 F.2d 895, 898 (9th Cir.1974); *Dodge v. Giant Food, Inc.*, 488 F.2d 1333, 1336–37 (D.C.Cir. 1973).

49. *Harper*, 139 F.3d at 1388 (citation and quotation marks omitted).

50. *Tavora*, 101 F.3d at 908; *Willingham*, 507 F.2d at 1091.

51. We can envision a different set of circumstances, however, in which an employer's grooming or appearance-based policies could give rise

to a claim of sex discrimination. An airline's policy of hiring only attractive female flight attendants provides one such example. *See Wilson v. Southwest Airlines Co.*, 517 F.Supp. 292 (N.D.Tex.1981). The Northern District of Texas rejected Southwest Airlines's defense that "it may discriminate against males because its attractive female flight attendants and ticket agents personify the airline's [image]." *Id.* at 293, 304. *See also Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 387–88 (5th Cir.1971).

52. Because we hold that all of the foregoing claims are not viable, we need not discuss the matters of class certification, the supplemental affidavit, and the supplements to the record because they were all based on these claims and are now mooted.

53. *Valdez Fisheries Dev. Ass'n, Inc. v. Alyeska Pipeline Serv. Co.*, 45 P.3d 657, 671 (Alaska 2002).

54. *Thompson's Estate v. Mercedes–Benz, Inc.*, 514 P.2d 1269, 1271 (Alaska 1973).

and judicial construction of Rule 15(a)."[55] And as the United States Supreme Court noted in interpreting the federal version of Rule 15(a) in *Foman v. Davis*, the rule's declaration that leave to amend "shall be freely given when justice so requires" is a "mandate" that "is to be heeded."[56] We have recognized that if there is no "apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'"[57] The trial court's proffered reason for denying the motion was untimeliness. There was no mention of undue delay, bad faith, or prejudice. Yet prejudice to the opposing party is the predominate factor in determining whether or not to grant leave to amend.[58] "[D]elay alone is an insufficient basis upon which to deny a motion to amend."[59] Even if a party unreasonably delayed moving to amend "it is an abuse of discretion to deny leave to amend where the opposing party was not misled or prejudiced by the amendment."[60] "The policy that a court should freely grant amendments limits a court's ability to deny leave to amend, and in a proper case, may warrant a finding of abuse of discretion in denying leave."[61]

We reversed the superior court's decision to deny leave to amend in *Betz v. Chena Hot Springs Group* after concluding that "the hardship to the [moving party] occasioned by denial of [the] amendment is great while the prejudice ... from allowing [leave] is not substantial."[62] We determined in *Betz* that the moving party's delay in filing a May motion to amend "was perhaps 'undue'" given the September trial date and the August discovery cut off.[63] "However, once the trial was put over for a year," we concluded that this "[delay] factor did not weigh heavily against the [moving party]."[64] Miller filed his motion to amend on May 10, 2002, the same month as the status hearing on the viability of the July 22, 2002 trial date, and within six months of the pretrial scheduling order which was issued by the trial court on November 16, 2001. The trial court ultimately vacated the July 2002 trial date and decided to postpone rescheduling until resolution of the summary judgment motion. The court also reopened discovery as to the issues raised by Safeway's summary judgment motion and pending discovery. Yet despite the fact that Miller filed his motion to amend the complaint in May 2002, the trial court did not issue a ruling on the amendment until January 7, 2003. Because the trial court ordered a status conference to review the trial schedule, subsequently vacated the trial date, reopened discovery on some matters, and then retained the motion under advisement for over seven months before ruling on it, Miller's motion to amend should not have been denied on the basis of undue delay.[65]

55. 3 James Wm Moore, Federal Practice § 15.14[1] (3d ed.2003).

56. 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

57. *Betz v. Chena Hot Springs Group*, 742 P.2d 1346, 1348 (Alaska 1987) (citing *Foman*, 371 U.S. at 182, 83 S.Ct. 227).

58. *Thompson's Estate*, 514 P.2d at 1271.

59. *Betz*, 742 P.2d at 1348.

60. *Kittredge Sports Co. v. Superior Court*, 213 Cal.App.3d 1045, 261 Cal.Rptr. 857, 859–60 (1989) (citing *Higgins v. Del Faro*, 123 Cal. App.3d 558, 176 Cal.Rptr. 704 (1981)); *see also Smith v. Costa Lines, Inc.*, 97 F.R.D. 451, 453 (N.D.Cal.1983) (holding that it may be held an abuse of discretion for the court to deny leave unless there is a demonstrable showing of prejudice to an opposing party); *Karn v. Coldwell Banker Residential Real Estate, Inc.*, 705 So.2d 680, 680–81 (Fla.4th DCA 1998) (holding that the trial court abused its discretion when it failed to grant leave to the moving party to amend their complaint before final summary judgment was entered).

61. 3 Moore, *supra* note 55, at § 15.14[1].

62. *Betz*, 742 P.2d at 1350.

63. *Id.* at 1349.

64. *Id.*

65. *See also Bamm, Inc. v. GAF Corp.*, 651 F.2d 389, 391–92 (5th Cir.1981) (The trial court abused its discretion in denying a motion to amend after it had retained the motion under

In *Betz*, we further considered the potential prejudice that may result to the nonmoving party and determined that when the new claim did not "require any additional fact finding ... [applying] a new legal theory to those facts is not the kind of prejudice that should defeat an amendment." [66] And as we recognized in *Gamble v. Northstore Partnership*, " 'the remedy for inadequate time to prepare on a new theory is a continuance, not preventing a trial on the merits of the new theory.' " [67] The amendments proposed by Miller all involved the same transaction and raised facts identical to the other claims pleaded. Given that the timeline for discovery was extended after Safeway received notice of Miller's new claims, Safeway was not unreasonably burdened by the task of preparing for litigation of the new theories. And because the trial date was postponed, Safeway had considerable time to conduct discovery before trial. As the United States Supreme Court stated in *Foman*, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." [68] The hardship to Miller occasioned by denying him the opportunity to test the merit of his claim outweighs any prejudice to Safeway.

Safeway last argues that the denial of the motion to amend was proper because it proposed claims that were futile. Miller's motion included claims for breach of the implied covenant of good faith and fair dealing, wrongful termination, and invasion of privacy. We will proceed to consider the alleged futility of these claims.

The implied covenant of good faith and fair dealing is a part of every employment contract in Alaska.[69] It "is designed to prevent the abuses of unfettered discretion inherent in a situation of unequal bargaining power." [70] "An employee is not required to leap at his master's every command." [71]

In *Bakken v. North American Coal Corp.*,[72] a federal district court in North Dakota found that a genuine issue of material fact existed as to bad faith and breach of the implied covenant when an employer represented to its employee that she could transfer her employment when her department was moved to another city but subsequently denied her this opportunity and terminated her due to the alleged elimination of her position.[73] Miller was also informed by Safeway that he would be able to transfer to another store in Kenai or Soldotna when the Oaken Keg store where he worked was scheduled to close. Safeway then terminated Miller on one week's notice based on his failure to cut his hair despite its previous decision to exempt Miller from the hair length policy for over two and a half years. Safeway has provided no reason for why it chose to enforce the hair length policy against Miller at the time of transfer. For purposes of this motion, Safeway has failed to show that it would be futile to allow Miller to claim that Safeway breached the implied covenant of good faith and fair dealing by terminating him despite its representation of continued employment in another city, or by wrongfully terminating him in violation of the public policy supporting the protection of employee privacy.[74]

advisement for nearly five months before denying it. "Much of the delay is attributable to the time spent in considering the motion.").

66. *Betz*, 742 P.2d at 1350.

67. *Gamble v. Northstore P'ship*, 907 P.2d 477, 484 (Alaska 1995) (quoting *Wright v. Vickaryous*, 598 P.2d 490, 496 (Alaska 1979)).

68. 371 U.S. at 182, 83 S.Ct. 227.

69. *Haroldsen*, 901 P.2d at 429.

70. *Stark v. Circle K Corp.*, 751 P.2d 162, 167 (Mont.1988) (citation omitted).

71. *Id.* at 167.

72. 641 F.Supp. 1015 (D.N.D.1986).

73. *Id.* at 1022–23.

74. In *Luedtke*, we recognized that violation by an employer of a public policy, including the policy supporting the protection of employee privacy, can constitute a breach of the implied covenant of good faith and fair dealing. *Luedtke*, 768 P.2d at 1130. In *Luedtke*, the discharge of employees who refused to submit to urinalysis did not constitute a breach of the implied covenant because the policy supporting employee privacy was outweighed by the policy supporting employee safety. *Id.* It is premature to determine that Miller's claim that his termination for refusal to cut his

## IV. CONCLUSION

Because we conclude that state action is required for a cause of action under Alaska's constitutional right of privacy, we AFFIRM the trial court's decision on this issue. Because Miller failed to produce evidence of discrimination on the basis of race, sex, or religion, we AFFIRM on all of these issues as well. And we conclude that issues pertaining to class certification, the supplemental affidavit, and supplements to the record are all subsequently mooted. But we REVERSE and REMAND the trial court's decision to deny Miller leave to amend his complaint because addition of the claims alleging breach of the implied covenant of good faith and fair dealing and wrongful termination did not prejudice Safeway, and it is premature to conclude that these claims had no merit.[75]

EASTAUGH, Justice, not participating.

---

hair breached the implied covenant is without merit.

Miller's motion to amend his complaint also included a stand-alone claim of invasion of his common law right to privacy. In *Luedtke*, we held that former employees who refused to take a drug test had no cause of action for invasion of privacy against their employer because the intrusion was prevented from taking place. *Luedtke*, 768 P.2d at 1138. Because Miller refused to cut his hair, no intrusion took place. Thus, his stand-alone invasion of privacy claim is futile.

**75.** In light of our reversal of the trial court's grant of summary judgment, all attorney's fees awarded by the trial court are vacated.