Steven D. KAY, Appellant/Cross–Appellee,

v.

DANBAR, INC., an Alaska corporation,
d/b/a RE/MAX of Wasilla,
Appellee/Cross–Appellant.

Nos. S–11008, S–11017.

Supreme Court of Alaska.

March 31, 2006.

Benjamin I. Whipple, Palmer, for Appellant/Cross–Appellee.

Rod R. Sisson and Craig Wm. Black, Sisson & Knutson, P.C., Anchorage, for Appellee/Cross–Appellant.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

Steven Kay sued RE/MAX of Wasilla for personal injuries suffered from a fall in a

duplex that he rented through RE/MAX. Kay initially limited his claim to damages of less than $100,000, thereby securing the advantage of limited discovery under Civil Rule 26(g). But he later attempted to claim additional damages and unsuccessfully moved to withdraw his election to proceed under Rule 26(g). The jury returned a verdict for Kay exceeding $400,000, but the court reduced the judgment to conform to Rule 26(g)'s $100,000 damages cap. Kay appeals, challenging the court's refusal to lift the damages cap. RE/MAX cross-appeals, asserting that the case should have been dismissed on summary judgment or by directed verdict because it owed no duty to protect Kay from physical injury. We reverse the superior court's order declining to lift the damages cap, finding no just reason to preclude Kay from increasing his claim to include new damages. But we affirm its orders denying RE/MAX's motions for summary judgment and directed verdict. We thus remand for a new trial on Kay's full damages claim.

## II. FACTS

In 1999, when Steven Kay first began looking for a place to rent, he contacted his mother, Jean Kay, a real estate agent at RE/MAX of Wasilla (RE/MAX). She was involved in sales, not rentals, so she referred her son to Kristan Cole (f/k/a Tanner), an agent in RE/MAX's property management division. Kristan Cole's stepsons, Aaron and Jesse Tanner (the Tanner brothers), owned a Wasilla duplex, which Kristan Cole, for a time, may have helped manage. Kay's mother showed Kay the duplex, which he agreed to lease from the Tanner brothers. The lease agreement designated RE/MAX as the "agent" for the Tanner Brothers. It instructed tenants, in the event of emergency, to immediately notify "management"; it also listed "Kristan Tanner at RE/MAX of Wasilla" as the only emergency contact.

Within a month after moving into the duplex, Kay slipped and fell on a loose carpet remnant on the landing of the stairs leading to the garage, badly fracturing his ankle. He sued the Tanner brothers and RE/MAX in February 2001, twenty-two months after he was injured. Kay's complaint alleged that

the defendants were negligent for failing to fasten or remove the carpet remnant and that the height of the stairs, the threshold, and the swing of the door to the garage did not satisfy code requirements. The defendants answered through their attorneys. In May 2001 the superior court set the trial to begin on April 29, 2002, and ordered discovery to close forty-five days before trial, March 15, 2002.

About one week after the superior court calendared the trial, Kay responded to multiple interrogatories and requests for production from RE/MAX and the Tanner brothers. Kay objected to these requests on the ground that discovery should be limited as specified under Alaska Civil Rule 26(g) because the case involved less than $100,000 in damages.

The parties cross-moved for summary judgment in January 2002. RE/MAX's motion asserted that the rental agreement did not give rise to a duty by RE/MAX to ensure the premises' safe condition. Kay sought partial summary judgment against both defendants on all issues except the nature and extent of damages. The superior court denied these motions, finding that genuine issues of material fact remained.

On March 5, 2002, fifty-five days before trial was scheduled to begin, Kay returned to his treating physician, Dr. Bret Mason. Later that same day, Kay filed a pleading withdrawing his opposition to the Tanner brothers' pending motion to compel discovery, and stated that he "also withdraws" his election to invoke the $100,000 Rule 26(g) damages cap. According to Kay, he took these steps because Dr. Mason had told him that he needed further medical care, including possible surgery, for his ankle to heal properly. Kay asserted that he hoped to know by the end of March whether surgery would be necessary. He also stated that he was "not opposed to a continuance" and that he would respond to the outstanding interrogatories and production requests "on or before March 22," seven days after discovery was to close.

Although Kay's Rule 26(g) withdrawal was not phrased as a motion and did not seek any expedited consideration, the defendants treated it as a motion and promptly opposed

it. Kay then filed a reply, indicating that he had produced the discovery information previously requested by the defendants and was in the process of responding to their interrogatories, but that he would nonetheless be "willing[ ] to postpone trial if necessary so the parties could obtain the relevant discovery desired and not be disadvantaged."

On April 22, seven days before the day set for trial, the superior court issued an order denying Kay's request to drop the Rule 26(g) cap. The order noted the tardiness of Kay's motion in light of other dates set by the pretrial order. The following day, Kay filed expedited motions asking the court to continue the trial and reconsider its order denying his attempt to withdraw the damages cap. The superior court denied both motions, and the case proceeded to trial.

Before submitting the case to the jury, the superior court denied RE/MAX's motions for a directed verdict. The jury found $425,000 in total damages; determined that RE/MAX, the Tanner brothers, and Kay had all acted negligently; and assigned seventy-five percent of the fault to RE/MAX, fifteen percent to Kay, and five percent to each of the Tanner brothers—who had settled with Kay on the eve of trial.

Kay then renewed his motion for reconsideration of the court's refusal to allow him to drop the Rule 26(g) cap. The superior court denied this motion and ultimately entered a judgment limiting Kay's award to $75,000, exclusive of attorney's fees, costs, and interest. Kay later moved to amend the judgment under Rule 60(b)(1) and (6), again arguing that the Rule 26(g) cap should not have applied. The court issued a notice of intent to deny Kay's motion. While the court later did enter an amended judgment, the only changes consisted of awarding attorney's fees and costs and altering the amount of prejudgment interest; the $75,000 principal did not change.

 Kay appeals, challenging the trial court's rulings on the Rule 26(g) cap and its denial of his motion for a continuance.[1] RE/MAX cross-appeals, challenging the superior court's denial of its motions for summary judgment and a directed verdict.

## III. DISCUSSION

### A. Kay's Motion To Withdraw the Rule 26(g) Cap on Damages

Alaska Civil Rule 26(g) provides for limited discovery and expedited calendaring in cases advancing claims for damages totaling less than $100,000:

> In a civil action for personal injury or property damage involving less than $100,000 in claims, the parties shall limit discovery to that allowed under District Court Civil Rule 1(a)(1) and shall avail themselves of the expedited calendaring procedures allowed under District Court Civil Rule 4.[2]

Kay first invoked Rule 26(g) in May 2001, one week after the superior court set his trial date, when his attorney objected to the Tanner brothers' extensive initial discovery requests; Kay's attorney asserted that discovery should be limited because the damages Kay claimed were less than $100,000. In response, the Tanner brothers and RE/MAX demanded that Kay either sign a stipulation regarding the $100,000 cap or provide the requested discovery within ten days. Kay

---

1. Kay also appeals the denial of his motion for partial summary judgment. Because Kay's brief merely incorporates his superior court arguments on the summary judgment issues, we deem these issues to be inadequately briefed, and we decline to consider them. *Anchorage Nissan, Inc. v. State,* 941 P.2d 1229, 1240 (Alaska 1997) (citing *Tenala, Ltd. v. Fowler,* 921 P.2d 1114, 1124 (Alaska 1996)); *Bidwell v. Scheele,* 355 P.2d 584, 587–88 (Alaska 1960).

2. Under Alaska District Court Civil Rule 1(a)(1), discovery is limited to disclosures required under Civil Rule 26(a), party depositions, and one additional deposition of a non-party. District Court Civil Rule 4(b) sets out procedures for expediting cases for trial, providing in relevant part:

> In a civil action for personal injury or property damage, unless otherwise permitted by order of the court in exceptional cases and for good cause shown, all parties shall file a memorandum to set the case for trial ... no later than 180 days after service of the complaint on all parties to the case.... After the court satisfies itself that the information described in Civil Rule 26(a) has been disclosed, the court shall set the case for trial as soon as practicable, but no sooner than 30 days after the court makes the determination regarding disclosure.

did not sign the proposed stipulation, but served initial disclosures suggesting that his damages totaled less than $100,000.

Six months later, at Kay's November 2001 deposition, Kay's counsel confirmed that Kay had elected to invoke Rule 26(g). He confirmed this election twice more: in a November 2001 letter to the Tanner brothers' counsel that explained Kay's continued refusal to provide requested discovery and in his December 2001 opposition to the defendants' motion to compel discovery.

Kay acknowledges on appeal that it was probably unwise to invoke Rule 26(g), since his case was not set for an expedited trial and "did not fit the rule procedurally." He also concedes that he "was slow to recognize [that] the rule did not fit the case factually"; because his expected damages "crowded so close" to the $100,000 cap, he should have realized that he was "cramming the case to fit the rule." [3]

RE/MAX characterizes Kay's invocation of Rule 26(g) as more deliberate. It argues that Kay was attempting to "manipulate" the civil rules in an effort to delay and/or avoid discovery—a kind of procedural "gamesmanship." Yet, Kay nonetheless argues that the superior court erred in denying his request to drop the Rule 26(g) cap; he points out that he informed the court that his expected damages would exceed the cap immediately upon learning that his ankle would require additional care, and that he agreed to take all steps necessary to avoid prejudice to the defendants.

■ We find Kay's arguments to be more persuasive. It is undisputed that Kay filed notice of his intent to withdraw his election to rely on the cap on the same day his doctor informed him that his ankle required further care. At the time almost two months remained before trial. Rule 26(g) does not

establish any procedure for withdrawing a Rule 26(g) election, and there is no prior Alaska case law addressing the issue.

As a practical matter, Kay's attempt to withdraw his election cap seems analogous to a claimant's motion for leave to amend a complaint under Alaska Civil Rule 15. Civil Rule 15(a) provides in part that "leave shall be freely given when justice so requires." We have construed that provision to favor amendments "absent a showing that the amendment would have resulted in injustice." [4] In so doing, we have endorsed rulings of the United States Supreme Court emphasizing that, under the parallel Federal Rule, amendments should freely be granted

> [i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.[5]

In our judgment, the same basic principles should apply when a party moves to withdraw a prior election to rely on the damages cap specified in Rule 26(g). Although Rule 26(g) does not incorporate language expressly requiring amendments to be "freely given," the policies underlying Rule 26(g) favor the same lenient approach counseled by Rule 15(a).

■ As already mentioned, a motion to withdraw an election to proceed under Rule 26(g) is functionally similar to a motion to amend a pleading: the plaintiff essentially seeks leave to amend its previously asserted damages claim. Thus, both the denial of a Rule 15 motion to amend and the denial of a motion to drop the Rule 26(g) damages cap operate to deprive the plaintiff of "an opportunity to test his claim on the merits." [6]

---

3. Kay's initial demand letter, sent to the defendants before Kay filed suit, demanded $104,657.33, while his initial discovery disclosures in May 2001 alleged damages of approximately $98,937.33.

4. *Ruckle v. Anchorage Sch. Dist.*, 85 P.3d 1030, 1039 (Alaska 2004).

5. *Betz v. Chena Hot Springs Group*, 742 P.2d 1346, 1348 (Alaska 1987) (quoting *Foman v. Davis*, 371 U.S. 178, 182–83, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)); *see also Miller v. Safeway*, 102 P.3d 282, 294 (Alaska 2004).

6. *Foman*, 371 U.S. at 182, 83 S.Ct. 227 (quoted with approval in *Betz*, 742 P.2d at 1350).

Moreover, Rule 26(g) strives to encourage—if not require—plaintiffs to file and prosecute personal injury actions as minor claims when it appears realistically likely that the damages will actually fall within the district court's limited jurisdiction. A rigid approach to enforcing Rule 26(g) elections would frustrate the rule's purpose by forcing cautious plaintiffs to file their original claims based not on a realistic prediction of likely recovery, but rather on the highest imaginable recovery. All but the smallest claims would then be filed as claims for damages of more than $100,000.

Considering the totality of the circumstances here in light of the same lenient test that applies under Rule 15,[7] we find nothing to indicate that denial of Kay's motion to revise the damages cap was warranted by the need to avoid injustice—no showing that Kay's motion reflected dilatory conduct or purposeful delay; that Kay made his request in bad faith; or that raising the cap would have unduly prejudiced RE/MAX.

When Kay first informed the superior court of his intent to withdraw his election, the trial date was still almost two months away, the case was relatively young, and there was no history of prior delay. Moreover, in setting the original trial date, the superior court had emphasized that its schedule was meant to be flexible: "I'm sure [that Kay's attorney is] aware, just from practicing here locally, if a party makes a motion to extend or to file something late for good cause shown, I almost always grant it. Our supreme court almost always says let's litigate on the merits[.]" In discussing the parties' expert disclosures, the court added that "[i]f we were setting this trial six months from now, it would be different [than] if we're setting it a year from now. But we're really setting it effectively a year from now.... I mean, if we're setting it six months out, then the deadlines make more sense."

The promise of flexibility communicated by these remarks seems mirrored by the parties' informal approach toward Kay's initial election invoking Rule 26(g)'s damages cap. After Kay's attorney responded to requests for full discovery by indicating Kay's intent to invoke the cap, RE/MAX's attorney sought confirmation of Kay's election at his November 2001 deposition. Kay's attorney acknowledged that he was invoking the rule for purposes of the overall litigation, but he observed that the cap would have no effect on the deposition. At the same time, Kay's attorney said that if the current prediction of damages changed, he might have to withdraw this election to rely on the cap. RE/MAX's attorney specifically asked if Kay actually was claiming damages totaling less than $100,000. The following exchange occurred:

MR. WHIPPLE [Kay's attorney]: That's our understanding of the damages at this point. If there's something that comes out that would change that, we would notify you immediately, and we would stipulate to an extension of discovery for that purpose.... That's our understanding at this point. But if there's a withdrawal of that, I'll let you know and we can stipulate to allowing more discovery.

MR. SISSON [RE/MAX's attorney]: Okay.

In opposing Kay's argument, RE/MAX now portrays Kay's attempt to relax the Rule 26(g) cap as a last-minute "tactical procedural choice[ ]," emphasizing that Kay "enjoyed thirteen months of being able to avoid nearly all of the defendants' discovery attempts." But as the quoted conversation demonstrates, Kay informed RE/MAX of the possibility that he might need to claim additional damages. And he later kept his word to "notify [RE/MAX] immediately" of any changes. Kay sought to withdraw his election on the same day he learned that his ankle would need additional care; and he offered to stipulate to an extension of the discovery period as well as a continuance, if RE/MAX deemed these steps necessary to protect its procedural rights. These circumstances do not reveal manipulative conduct, bad faith, or dilatory practice.

---

7. We review lower courts' rulings on Rule 15 motions for abuse of discretion. *See, e.g., Betz,*

742 P.2d at 1348.

Nor did the superior court find any manipulation, misconduct, or danger of actual prejudice. To the contrary, the court expressly declined to fault Kay for the last-minute nature of his request. In denying Kay's motion to continue the trial, the court observed that "it doesn't appear that this is counsel's fault or plaintiff's fault, it's just the way things happen." Because RE/MAX fails to show that this finding is clearly erroneous, the finding defeats RE/MAX's attempt to depict Kay's motion as a mere tactical ploy.

The only reasons identified by the superior court for denying Kay's motion were the lateness of the motion and the need to enforce the original schedule in the general interest of avoiding delay. Yet in analogous circumstances we have previously emphasized that "[d]elay alone is an insufficient basis upon which to deny a motion to amend." [8]

Similarly, we hold that delay alone could not justify denying Kay's request to change his election here. Absent a case-specific showing of dilatory conduct, bad faith, or unavoidable prejudice that might cause actual injustice, we conclude that it was an abuse of discretion to deny Kay's motions to drop the damages cap.

This conclusion requires us to consider how the error can be cured. Kay suggests that we should simply disregard the cap and order judgment entered in his favor based on the damages actually awarded by the jury. But this approach is untenable because it would result in obvious injustice to RE/MAX. Had Kay's motions to withdraw his election and for a continuance of the trial been properly granted, RE/MAX would have had the opportunity to conduct the full discovery that it sought from the outset. More importantly, with the damages claim uncapped from the outset of trial, RE/MAX might have chosen to conduct its defense much differently on disputed issues of liability and damages.

■ Because the error in denying Kay's motions had an obvious yet incalculable impact on RE/MAX's efforts to prepare and defend its case, we conclude that it is necessary to vacate the jury's verdict and remand for a new trial after affording both parties the opportunity to conduct full discovery.[9]

## B. RE/MAX's Motions for Summary Judgment and a Directed Verdict

RE/MAX contends on cross-appeal that Kay's claims against it should never have reached the jury.[10] RE/MAX moved for summary judgment before trial and for directed verdicts at the close of Kay's evidence and at the end of the case. RE/MAX argues that Kay's claims against it should have been dismissed at each of these junctures because there was no evidence that RE/MAX owed or breached any legal duty to ensure Kay's safety or protect him from dangerous conditions at the duplex. RE/MAX first contends that it undertook no contractual duty toward Kay. It then argues that even if it owed Kay certain contractual duties as a manager of the property, these duties did not extend to protecting him from personal injury caused by dangerous conditions on the premises. Kay responds that (1) the lease agreement imposed a duty of care on RE/MAX, and (2) RE/MAX assumed a duty as a result of Kristan Cole and RE/MAX's undertaking of management responsibilities.

### 1. Standard of review

■■ In reviewing a denial of a summary judgment motion, we apply de novo review and draw reasonable inferences of fact in favor of the non-moving party to determine whether any genuine issues of material fact exist and whether the moving party was entitled to judgment as a matter of law.[11] Sum-

---

**8.** *Miller,* 102 P.3d at 294 (quoting *Betz,* 742 P.2d at 1348).

**9.** Because RE/MAX proceeded to trial on the understanding that it faced a potential liability of $100,000, we also hold that Kay may alternatively elect remittitur in the amount of $100,000 and forgo the option of a new trial.

**10.** We must address this issue despite our decision to vacate the original verdict, and remand the case for a retrial, because outright dismissal of Kay's claim would be warranted if RE/MAX prevailed on its cross-appeal.

**11.** *Botelho v. Griffin,* 25 P.3d 689, 692 (Alaska 2001).

mary judgment is appropriate if "the only reasonable inference from the undisputed facts is that one party owed another no duty" or owed a duty "clearly and vastly narrower in scope" than that asserted by the non-moving party.[12] Questions about the scope of a duty are generally not susceptible to summary judgment if the scope of the duty poses a fact-specific question involving policy and circumstantial judgments better reserved for the jury.[13]

■ "When reviewing the denial of a motion for a directed verdict, we must 'determine whether the evidence, when viewed in the light most favorable to the non-moving party,'" is sufficient to allow reasonable jurors to " 'differ in their judgment as to the facts.'"[14] "If there is room for diversity of opinion among reasonable people, the question is one for the jury."[15]

## 2. Evidence that RE/MAX undertook a contractual duty toward Kay

■ When interpreting a contract, we give effect to the parties' intentions by looking to the words of the contract and any extrinsic evidence regarding intentions when they entered into the contract, including evidence of the parties' subsequent conduct.[16] But the words of the contract remain the most important evidence of intention[17] and, unless otherwise defined, are given their "ordinary, contemporary, common meaning."[18]

Although contract interpretation is usually a question of law, it becomes a question for the trier of fact "when the parties present extrinsic evidence to clarify a contract's meaning, when this evidence points towards conflicting interpretations ... and when the contract itself is reasonably susceptible of either meaning."[19]

RE/MAX contends that it was not a party to the lease agreement drafted by the Tanner brothers; it insists that affidavits filed by the Tanner brothers and Kristan Cole in support of its summary judgment motion establish that the lease's references to RE/MAX resulted from the Tanner brothers' inadvertent failure to edit them out of a form agreement given to them by Cole. Cole's affidavit states that she had "a Re/Max agency relationship with Danbar, Inc., an Alaska Corporation, d/b/a/ Re/Max of Wasilla," and that she supplied her stepsons with a RE/MAX rental agreement form on a floppy disk, instructing them to delete the references to RE/MAX. Cole testified to the same effect at trial.

■ But it is undisputed that the lease agreement was executed with references to RE/MAX remaining intact. And RE/MAX presented no evidence that the Tanner brothers ever informed Kay of their subjective intent to exclude RE/MAX from the lease.[20]

**12.** *Guerrero v. Alaska Hous. Fin. Corp.*, 6 P.3d 250, 257 (Alaska 2000).

**13.** *Lynden Inc. v. Walker*, 30 P.3d 609, 613 (Alaska 2001). In *Estate of Breitenfeld v. Air–Tek, Inc.*, we explained:
 Whether a party voluntarily assumed to perform a particular act is a question of fact. By its assumption to act, the party may become subject to a duty to act carefully. Although the precise nature and extent of that duty is a question of law, it depends on the nature and extent of the act undertaken, a question of fact. 755 P.2d 1099, 1102 (Alaska 1988) (citations omitted).

**14.** *K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 722 (Alaska 2003) (quoting *Ben Lomond, Inc. v. Schwartz*, 915 P.2d 632, 635 (Alaska 1996)).

**15.** *Sherbahn v. Kerkove*, 987 P.2d 195, 198 (Alaska 1999) (quoting *Petersen v. Mutual Life Ins. Co.*, 803 P.2d 406, 410 (Alaska 1990)).

**16.** *Sourdough Dev. Servs. v. Riley*, 85 P.3d 463, 468 (Alaska 2004); *Municipality of Anchorage v. Gentile*, 922 P.2d 248, 256 (Alaska 1996).

**17.** *K & K Recycling, Inc.*, 80 P.3d at 712.

**18.** *Norville v. Carr–Gottstein Foods Co.*, 84 P.3d 996, 1001 n. 3 (Alaska 2004).

**19.** *Id.* at 1004 (quoting *Little Susitna Constr. Co. v. Soil Processing, Inc.*, 944 P.2d 20, 23 (Alaska 1997)).

**20.** *Cf. id.* at 1003 ("Testimony of a party as to his subjective intentions concerning the meaning of a particular clause in a contract is not probative unless the party in some way expressed or manifested his understanding at the time of contract formation."); *Peterson v. Wirum*, 625 P.2d 866, 870 (Alaska 1981).

Moreover, many of the lease's references to RE/MAX could reasonably be read as deliberate. The most significant items include:

- the heading of the rental agreement which states in large font, "RE/MAX of Wasilla";
- the first page which identifies "RE/MAX of Wasilla (hereinafter called agent for Aaron & Jesse Tanner the Owner/Landlord)";
- the provision which states rent will be payable to "Owner/Landlord's agent[']s address: RE/MAX of Wasilla 1590 E. Financial Dr. Suite 200, Wasilla, Alaska";
- the reference to "Kristan [Cole] at RE/MAX" as the emergency contact for tenants; and
- the signatory page which shows Kristan Cole's initials above the byline, "RE/MAX of Wasilla" and "Agent/Broker for Landlord." [21]

The lease agreement itself thus raised triable issues of fact as to the parties' reasonable expectations upon executing the lease.

Furthermore, Kay presented additional evidence regarding the circumstances of contract formation. Kay testified that a RE/MAX agent (his mother) showed him the property; the duplex was listed as property managed by RE/MAX; and Kay applied and was accepted as a tenant through RE/MAX.

■■■■ As we explained in *Sea Lion Corp. v. Air Logistics of Alaska, Inc.*, when written or spoken words or any other conduct of the principal, if reasonably interpreted, cause third persons to believe the principal consents to having the act done on his behalf by the person purported to act for him, we recognize apparent authority sufficient to bind a principal.[22]

Drawing all permissible inferences in favor of Kay, the superior court correctly determined that genuine issues of material fact existed as to Kay's contractual relationship with RE/MAX. Similarly, there was sufficient evidence at trial to allow a reasonable juror to conclude that the Tanner brothers had chosen to retain the lease agreement's references to RE/MAX because RE/MAX, through Kristan Cole, actually undertook to be the property manager of the duplex and intended to bind itself as a party to the contract.

The superior court did not err in denying RE/MAX's motion for summary judgment or its motions for a directed verdict on this issue.

### 3. Scope of RE/MAX's duty toward Kay

■■■■ RE/MAX further argues that even if it became a party to the rental agreement by contractually undertaking to manage the rental, there was no basis for the jury to find that it owed and breached a duty to protect Kay from personal injuries caused by dangerous conditions on the rental property.

We have long recognized that duties may be voluntarily assumed.[23] For example, we held in *Adams v. State* that when the state undertakes a fire inspection, it has the further duty to exercise reasonable care in conducting the inspection.[24] In *LaMoureaux v. Totem Ocean Trailer Express, Inc.* the question was whether a union owed a duty of care to a victim of a truck collision to ensure that union members dispatched to drive were qualified drivers.[25] The agreement between a trucking company and the union provided only that the union would dispatch regular and experienced longshoremen.[26] Based on

**21.** The last page of the agreement also states, "Tenant is aware the property manager is related to the owners."

**22.** *Sea Lion Corp. v. Air Logistics of Alaska, Inc.*, 787 P.2d 109, 117 n. 3 (Alaska 1990) (citing *City of Delta Junction v. Mack Trucks, Inc.*, 670 P.2d 1128, 1130 (Alaska 1983)).

**23.** *LaMoureaux v. Totem Ocean Trailer Exp., Inc.*, 651 P.2d 839, 841 n. 4 (Alaska 1982); *Adams v. State*, 555 P.2d 235, 240 (Alaska 1976) ("It is

ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully ....") (quoting *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275, 276 (1922)).

**24.** *Adams*, 555 P.2d at 240.

**25.** *LaMoureaux*, 651 P.2d at 840.

**26.** *Id.* at 841.

testimony that the union had actually undertaken the responsibility to supply competent and licensed drivers, we concluded that a genuine issue of fact existed about whether the union had voluntarily assumed a duty of care to ensure that members dispatched as drivers could lawfully drive even though the contract did not explicitly require the union to check its members' driving qualifications.[27]

Here, the rental agreement seemingly designated RE/MAX as the property manager and assigned several specific responsibilities to the "management."

First, the section entitled "Rules" specified that the rules for the premises are set by "management." Second, the subsection entitled "Cleanliness and Trash" required the tenant to assist "management" in keeping outside areas and common areas clean. Third, a subsection entitled "Maintenance, Repairs, and Alterations" required the tenant to assist "management" in keeping walkways clear and salted in winter months—a duty usually belonging to the owner or occupier of the land.[28] This subsection also prohibited any alterations without the written consent of "management," and required the tenant to inform the "management," not the owners, in writing of any items needing repair—including electrical and plumbing fixtures and smoke detectors. In the event of an emergency, the lease demanded immediate notice and insisted that all service requests be made only to the "property manager." The lease further identified "Kristan Tanner at RE/MAX" as the emergency contact.

Additional evidence at trial suggested that RE/MAX had undertaken an even broader range of duties than the management responsibilities explicitly mentioned in the rental agreement. Kay testified at his deposition that RE/MAX's responsibilities included listing the duplex in RE/MAX's property management division, providing one of its agents the keys for showing the duplex to Kay, providing a standard RE/MAX residential agreement form to Kristan Cole for her use, processing Kay's rental application in RE/

MAX's office, giving Kay his set of keys, and accepting Kay's rent at RE/MAX's office. Kay also testified that he notified RE/MAX of a sewer system problem and that Kristan relayed this information to the Tanner brothers. Moreover, the rental agreement identified RE/MAX as "agent for Aaron & Jesse Tanner the Owner/ Landlord."

Finally, Daniel Crozier, the owner of RE/MAX's Wasilla branch, testified that RE/MAX "acted as landlord on this property" and that it would be "correct" to say that "as far as Mr. Kay [was] concerned ... Re/Max stood in the shoes of the Tanners"—the property owners. In closing arguments RE/MAX acknowledged that "it is not a huge leap to come to a conclusion about whether an owner of a premises has a duty to take care of the premises, *to inspect it and so forth.*" (Emphasis added.)

In sending the case to the jury, the superior court submitted numerous jury instructions on the issue of duty, including the following instruction based on Restatement (Second) of Torts § 324A (1965), which allowed RE/MAX to be held liable if the jury found that it undertook and breached a duty to protect Kay from physical harm:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

RE/MAX does not challenge this instruction as such; it argues only that the evidence was insufficient to justify submitting it to the jury. But we think that a reasonable juror viewing the totality of evidence in the light most favorable to Kay could logically find, under this instruction, that RE/MAX had

---

**27.** *Id.* at 840–41.

**28.** *Coburn v. Burton,* 790 P.2d 1355, 1357 (Alaska 1990) ("Under [the Uniform Residential Landlord and Tenant Act] as under the common law, the primary obligation to remove snow and ice in common areas falls upon the landlord[.]").

assumed significant property management responsibilities on behalf of the Tanner brothers.

We note that other jurisdictions applying Restatement § 324A in analogous cases have found that property managers assume at least a limited duty to protect tenants, even if the managers have not taken over the entire charge of the land or the building. For example, in *Kirschbaum v. WRGSB Associates*, a property management agreement obliged the property manager to "maintain" the building in good condition and to make repairs.[29] Applying Pennsylvania laws similar to the Restatement, the court affirmed a judgment holding that the property manager was responsible for injuries stemming from its failure to repair a defective handrail, but had no duty to fix structural defects in the staircase.[30]

In the present case, we think that a reasonable juror could similarly conclude that the management responsibilities RE/MAX assumed encompassed a duty of due care to inform itself of the condition of the premises and to take reasonable steps to protect the tenants against non-obvious dangers, either by arranging for repairs of non-structural problems or by giving the tenants adequate warnings.

We recognize that section 387 of the Restatement (Second) of Torts limits the circumstances under which a property manager's duties would be as broad as a landlord's:

An independent contractor or servant to whom the owner or possessor of land turns over the *entire charge of the land* is subject to the same liability for harm caused to others, upon or outside of the land, by his failure to exercise reasonable care to maintain the land in safe repair as though he were the possessor of the land.[31]

Comment a to this section goes on to say that

the contractor must have taken over the entire charge of the land or building. It is

not enough to create liability ... that he has undertaken to make specific repairs, or even to inspect the land or building and from time to time to make such repairs as he should discover to be necessary.[32]

Here, we doubt that the evidence could reasonably support a finding that RE/MAX undertook complete control and responsibility for the Tanner brothers' duplex, so as to make it responsible for curing major structural defects. But we need not resolve that issue. For present purposes, it suffices to observe that the evidence in this case would have allowed the jury to find that RE/MAX undertook and breached the considerably more modest duty to exercise due care by using its expertise as a property manager to take reasonable steps in inspecting the premises and warning Kay about dangers that might not be obvious to an ordinary tenant.

As noted above, comment a to the Restatement § 387 states that liability to remedy structural defects should not be imposed against a property manager unless the manager takes over the "entire charge" of the property, even if it has *"undertaken to ... inspect the land or building."* [33] The comment thus implicitly recognizes that a property manager who undertakes broad duties without taking over "the entire charge" might be held liable for assuming, and then breaching, more modest duties to inspect, make minor repairs, and warn tenants of non-obvious dangers.

Because the evidence at trial was at least minimally sufficient to allow a jury to find that RE/MAX undertook limited responsibilities to protect Kay from personal injury and thus owed and violated a duty to take reasonable steps to protect Kay from unobvious dangers on the premises, we conclude that the superior court did not err in submitting the case to the jury.

## IV. CONCLUSION

For these reasons, we AFFIRM the superior court's rulings on RE/MAX's motions for

---

**29.** 243 F.3d 145, 153 (3d Cir.2001).

**30.** *Id.* at 154.

**31.** RESTATEMENT (SECOND) OF TORTS § 387 (1965) (emphasis added).

**32.** RESTATEMENT (SECOND) OF TORTS § 387, cmt. a (1965).

**33.** RESTATEMENT (SECOND) OF TORTS § 387, cmt. a (1965) (emphasis added).

summary judgment and directed verdicts. But we REVERSE its ruling on Kay's motion to withdraw his Rule 26(g) election; we thus VACATE the judgment, and REMAND for a new trial unrestricted by Rule 26(g)'s damages cap.

EASTAUGH, Justice, dissenting.

EASTAUGH, Justice, dissenting.

## I. Introduction

I respectfully dissent from that part of the opinion that reverses on the Alaska Civil Rule 26(g) issue. A trial court faced with these sorts of procedural problems on the eve of trial is entitled to exercise its discretion in resolving the problems and is entitled to deference upon appellate review.[1] Kay consistently invoked Rule 26(g) to prevent the defendants from engaging in rigorous discovery, and in exchange, chose to subject himself to the rule's $100,000 damages cap. Only ten days before discovery was to close, and having successfully and repeatedly limited the defendants' discovery efforts, he unilaterally (without asking the court's permission) tried to give notice that he was withdrawing his reliance on the rule. This attempt, only fifty-five days before trial, would have freed him from the rule's $100,000 damages cap. Although it also would have exposed him to additional discovery efforts, they would have been last-minute, eve-of-trial, efforts. They were unlikely to have been as productive as defendants' timely discovery efforts would have been had Kay not avoided them by electing to invoke the rule. Only a week before trial was to begin did Kay first request a continuance. Two days before trial began, the trial court rejected Kay's efforts to disavow the rule and lift the cap. That was a permissible judicial decision, well within the discretion a trial court must have. By reversing, we interfere with a valid exercise of discretion and fail to give deference to the trial court.

## II. There Was No Abuse of Discretion.

The legislature included Rule 26(g) in its 1997 tort reform legislation.[2] The legislature intended the act to "encourage the efficiency of the civil justice system by discouraging frivolous litigation and by decreasing the amount, cost, and complexity of litigation without diminishing the protection of innocent Alaskans' rights to reasonable, but not excessive, compensation for tortious injuries caused by others."[3] The rule patently assumes that a moderate damages cap is a fair quid pro quo for a significant limit on discovery. As with other fair bargains, unilateral disavowal of the bargain after one side has performed is potentially unfair. Given Kay's early election and his repeated invocations of the rule to limit discovery, his late filing of the unilateral withdrawal notice would have been inherently unfair had withdrawal been allowed. The trial court must have concluded that Kay's attempted withdrawal would be unfair. Likewise, the court must have concluded that granting Kay's last-minute continuance motion would be unfair.

We review discovery orders and denials of motions for reconsideration, continuance, and relief from judgment under the abuse of discretion standard.[4] This is, or is supposed to be, a deferential standard of review. We will find an abuse of discretion only when we are left with a definite and firm conviction after reviewing the record that the trial court erred.[5] Given the circumstances facing the trial court, I do not have a definite and firm conviction that the trial court erred.[6]

---

1. *See Willoya v. State, Dep't of Corr.*, 53 P.3d 1115, 1119 (Alaska 2002); *Dougan v. Aurora Elec. Inc.*, 50 P.3d 789, 793 (Alaska 2002).

2. Ch. 26, §§ 1, 48, SLA 1997.

3. *Id.* at § 1(1).

4. *Manelick v. Manelick*, 59 P.3d 259, 262 (Alaska 2002) (reviewing denial of motion for reconsideration); *Fleegel v. Estate of Boyles*, 61 P.3d 1267, 1278 n. 51 (Alaska 2002) (applying abuse of discretion standard to review of relief from judgment); *Tesoro Petroleum Corp. v. State*, 42 P.3d 531, 535 (Alaska 2002) (reviewing generally rulings on discovery for abuse of discretion).

5. *Rockstad v. Erikson*, 113 P.3d 1215, 1220 (Alaska 2005).

6. Finding, as the court does, that the appellant's arguments are "more persuasive" than the appellee's seems at odds with the deferential standard of review that applies here. *See* Op. at 266.

### A. A motion to amend a complaint is not analogous to an attempt to withdraw from a Rule 26(g) election.

The court's opinion states that an attempt to withdraw an election of the Rule 26(g) damages cap is "analogous to a claimant's motion for leave to amend a complaint under Alaska Civil Rule 15."[7] It also contends that a motion to withdraw the Rule 26(g) cap is "functionally similar to a motion to amend a pleading" because the plaintiff "essentially seeks leave to amend its previously asserted damages claim."[8]

I think the court is mistaken in both regards: no such attempt to amend was made here, and Rule 15 provides no analogy. Kay did not seek judicial permission to amend his complaint or his previously asserted damages claim. He simply filed a notice with the court that he was withdrawing from Rule 26(g). Only later, after another three weeks had passed, did he implicitly seek court approval of his withdrawal from his election. The court suggests that prohibiting Kay from withdrawing from the rule would deprive him of the opportunity to test his claim on the merits.[9] I agree that a plaintiff should be able to test his claims on the merits.[10] But a damages cap does not affect a plaintiff's ability to test his claim on the merits. Kay was still able to bring all applicable legal claims to trial; only his recoverable damages were limited by the affirmative choice he made early in the litigation in exchange for the benefit of limited discovery.

7. *Id.*

8. *Id.* at 266.

9. *Id.*

10. *See* Alaska R. Civ. P. 15(a); *Miller v. Safeway, Inc.*, 102 P.3d 282, 295 (Alaska 2004).

11. The court states that Kay served initial disclosures "suggesting" that his damages totaled less than $100,000. Op. at 265–66. That characterization minimizes the specificity of Kay's disclosure. His disclosure stated:

 G. Categories of damage.

 Past medicals: $21,937.33
 Future medical: $ 5–10,000 approx.

Nor was the procedure Kay followed at all analogous to a motion to amend a complaint. A Rule 15 motion to add a new claim or amend the damages prayer is not typically inconsistent with the plaintiff's affirmative representations and the parties' mutual understandings. An attempt to withdraw from a Rule 26(g) election fundamentally differs from a motion to amend because the election consists of an affirmative representation that damages will not exceed $100,000, and results in significant limitations on discovery. The election, per the rule, results in a mutual understanding by the parties. The resulting expectations are reasonable and enforceable. Moreover, in this case, Kay repeatedly invoked the cap to limit defense discovery efforts. As an example of a *valid* analogy, consider instead a plaintiff's affirmative statement that he is forgoing a particular claim in exchange for some bargain with the defendant. In that situation, a trial court ruling on whether to rescind the agreement would be entitled to the same deference we should be giving the trial court here. Our usual expressions of the liberal policy favoring amendment of pleadings would be irrelevant to a valid analogy.

### B. Withdrawal of the Rule 26(g) cap would have prejudiced RE/MAX.

Kay first invoked Rule 26(g) in May 2001, three months after filing his complaint, when he responded to the Tanners' initial discovery requests.[11] Kay continued to invoke Rule 26(g) in response to further defense discovery requests until shortly before he filed his notice of withdrawal in March 2002.

Past wages: $ 17,000, minus taxes
Reduced abilities: $ 15,000 approx.
Pain & suffering: $ 35,000 approx.

The disclosed total was less than $99,000. To read "approx." as an indication Kay either was uncertain or wanted defendants to think he was uncertain about his damages is inconsistent with his explicit invocations of the discovery limitation in first responding to discovery and then repeatedly fending off defendants' discovery attempts. The disclosed total closely approached $100,000. We must assume Kay's counsel was acting in good faith and understood the rule's unambiguous effect on damages. "[A]pprox." must therefore be read to imply that the actual damages were less than the disclosed total. Any other reading would be inconsistent with candor and good faith.

Despite the text of Rule 26(g),[12] Kay knowingly took affirmative steps to invoke the rule throughout the pre-trial period. Kay used Rule 26(g) to shield himself from defendants' discovery efforts for nearly ten of the fifteen months between the filing of the complaint and the scheduled trial date and for nearly all of the time when discovery was open.

Kay argues that he gained no advantage from trying to withdraw from Rule 26(g), but his unilateral efforts to avoid discovery forced his opponents to file a motion to compel, requiring them to spend additional resources to obtain discovery. His efforts also limited and delayed the allowable discovery. Defendants prepared their defense believing that, per the rule, their damages exposure could not exceed $100,000. Defendants who are sued for personal injury guide their litigation efforts by the risks the lawsuit poses. It is often the damages exposure, more than the liability exposure, that drives how a lawsuit is litigated. A defendant may choose not to litigate as vigorously in a case that can be defended through trial at relatively modest cost if the damage exposure is limited. In contrast, if damages might be much greater and uncapped, a defendant will usually litigate more aggressively to discover all facts relevant to liability (including allocation of fault and causation) and damages, may engage in motion practice to limit its exposure, may prepare for trial far more thoroughly, and may finally chose to avoid trial with a favorable settlement after appropriate discovery and investigation.

It is impossible to imagine how RE/MAX would have defended the case had Kay not invoked the Rule 26(g) cap. If Kay had given timely indication he would claim much greater losses, RE/MAX would have had

time to reassess its defensive efforts. Indeed, it is precisely because the late effort to withdraw *was* prejudicial to RE/MAX that this court has fashioned its remedy and its remand instructions so carefully.[13]

A short continuance would not have remedied the prejudice, given the lost discovery opportunity. And a long continuance would not have avoided prejudice because defendants would have needed to prepare for trial a second time, at additional cost, and witness memories would have faded.

It is hard to be very sympathetic to Kay. His lack of diligence caused the problem. Had he been reasonably diligent about his medical treatment, his doctor would have informed him of the likelihood of further surgery early enough that withdrawal of the election would not have prejudiced RE/MAX. Had he been reasonably diligent about his trial preparation, he would have included a knowledgeable estimate of future medical expenses in his damage estimate. Kay also could have moved for a continuance immediately after visiting his doctor for the first time since filing suit, on March 5, 2002, rather than allowing nearly fifty more days to pass before moving for a continuance. The lateness of Kay's visit to his doctor, coupled with his delay in requesting a continuance, reflects either a lack of diligence or a tactical choice. In any event, Kay asked for an open-ended continuance pending the resolution of his medical condition. His request as made was patently without merit. An indefinite delay of trial is "undue" and is not a proper use of a trial continuance.[14]

## C. The record supports the trial court's decision.

The court suggests that the trial court promised at the May 2001 trial setting con-

---

12. The text of Rule 26(g) suggests that the damages cap is self-executing: "In a civil action for personal injury or property damage involving less than $100,000 in claims, the parties *shall* limit discovery." (Emphasis added.) The court's opinion does not address the difficulties created by this text. Regardless of whether he needed to "invoke" Rule 26(g)'s limited discovery shield (or whether it was appropriate to do so in this context), Kay did so repeatedly and as such chose to bring his case within the rule's ambit.

13. *See* Op. at 268. Thus, this court approves the alternative remedy of remittitur because it acknowledges that RE/MAX "proceeded to trial on the understanding that it faced a potential liability of $100,000." Op. at 268 n. 9.

14. In the complaint amendment context, we have repeatedly stated that "undue" delay is a sufficient basis to deny a motion to amend. *See Miller*, 102 P.3d at 294; *Betz v. Chena Hot Springs Group*, 742 P.2d 1346, 1348–49 (Alaska 1987).

ference to be flexible in its scheduling decisions,[15] and implicitly concludes that it was not flexible after Kay belatedly tried to change the ground rules for the lawsuit.[16] I do not read the trial court's statements as amounting to an enforceable "promise of flexibility." [17] Although the trial court stated that it would usually grant motions to extend or file late for good cause shown, it also repeatedly emphasized that it did not want pre-trial deadlines crowding too close to the trial date and potentially delaying the trial. The trial court's decision not to allow Kay to withdraw from Rule 26(g) is consistent with its previous statements expressing concern about late filings and delay of trial. The court's trial setting comments could not have misled Kay, and reliance on them to justify the late withdrawal and eve-of-trial continuance efforts would have been unreasonable. Kay had to understand that such efforts are addressed to the trial court's discretion.

## III. Conclusion

The trial court was in the best position to assess how Kay's invocation of Rule 26(g) affected the course of the lawsuit. It exercised its discretion in dealing with the potential prejudice created by Kay's last minute attempts to withdraw from the damages cap and continue the trial. Because I do not have a definite and firm conviction that the trial court erred, I cannot conclude that it abused its discretion here.