Frank MILLER, Appellant,

v.

SAFEWAY, INC., and Mick Galic, Appellees.

No. S–12331.

Supreme Court of Alaska.

Nov. 2, 2007.

John E. Havelock, Law Offices of John E. Havelock, Anchorage, for Appellant.

Cynthia L. Ducey, Eric Ringsmuth, Delaney Wiles, Inc., Anchorage, for Appellees.

Before: FABE, Chief Justice, MATTHEWS, BRYNER, and CARPENETI, Justices.

OPINION

MATTHEWS, Justice.

## I. INTRODUCTION

Frank Miller claims that Safeway breached the implied covenant of good faith and fair dealing when it terminated his employment based on his failure to comply with Safeway's grooming policy by not cutting his hair. Neither the grooming policy itself nor Safeway's actions with respect to the termination breached the implied covenant. We therefore affirm the superior court's grant of summary judgment to Safeway.

## II. FACTS

This is the second time this case has come before this court. In the first opinion, *Miller v. Safeway* (*Miller I*), the facts were set out as follows:

> Frank Miller is an Athabascan Indian and a member of the Kenaitze tribe. Miller holds shares in Kenai Native Association, Inc. and Cook Inlet Region, Inc., and is an Alaska Native under federal law. Miller has worn his hair shoulder length or longer all his life, with the exception of the period of time he served in the United States Navy between 1961 and 1966. In an affidavit, Miller explained his reasons for growing long hair: "I personally like to have my hair long and feel it is an expression of my natural personality, my spirituality and my ties with Alaska Native tradition." Miller maintains that his mother, who was also Athabascan, raised Miller's awareness of his Native culture and tradition and passed down to him the Native practice of growing hair long.

> On July 29, 1998, Miller was hired to work as a sales clerk for a Carrs supermarket in the Oaken Keg, the section of the store that markets liquor. Miller indicates that the Oaken Keg knew that he was an Alaska Native due to his appearance and his statement that he is "American Indian/Alaskan Native" on employee ethnicity records gathered by Safeway in August 1998. The store manager who hired Miller informed him that he would be allowed to keep his hair long so long as he kept it tied back, notwithstanding the printed dress code for Carrs employees. The dress code policy recites, under a section entitled "General Appearances":

>> Well groomed and conservatively styled hair.

>> a. Men's hair: No longer than collar length. No beards.

>> Mustaches acceptable if neatly groomed and not curved over lower lip. Sideburns should not extend below the ear lobe.

>> b. Women's hair: Neatly styled.

> The introduction to the Oaken Keg policies also included the following statement regarding Miller's terms of employment:

>> When you begin with the Oaken Keg, you will be on a probationary status. At the end of (90) days, upon successful completion of the probationary period, you will become a permanent employee.

> Miller was not advised that he was in violation of the dress code or that he must cut his hair until February of 2001, more than two years and seven months after he was hired. Joe Price, Miller's supervisor, did not initially make any comments to Miller regarding hair length. Safeway purchased Carrs in April 1999, and Miller attended a Safeway orientation in June 1999 in which the Safeway dress code policy for male employees reiterated the previous Carrs policy that the hair length of male employees "should not exceed the collar-line." Although Miller's hair was noticeably long and fell below the collar line, none of the supervisors or trainers at the orientation directed any comments to Miller concerning his hair. Sometime after the orientation, Miller and Price had a conversation in which Miller recalls that Price remarked, "unless they say something to me, you are not required to get a haircut."

> In January 2001, a year and a half after Safeway acquired Carrs, Miller learned that the Oaken Keg store where he worked was scheduled to close the next month. In late January 2001 all store employees, including Miller, were informed by letter or memorandum that they would have a job in either the Soldotna or Kenai Carrs stores. Miller states that he expected that

he would be transferred to one of these other stores. According to Miller, he received regular job evaluations in which his performance was judged good to excellent in every respect.

Close to a week before the store closed, Price informed Miller that, according to Safeway manager Mick Galic, if Miller wanted to transfer to another store he would have to cut his hair. Miller told Price that he would not cut his hair. As a result, Safeway terminated Miller.[1]

## III. PROCEEDINGS

Miller filed a class action complaint on June 8, 2001, alleging that Safeway violated his constitutional rights to privacy and freedom of speech.[2] He also claimed that Safeway violated the Alaska Constitution, AS 18.80.220, and AS 22.10.020 by discriminating on the basis of creed and religion.[3] The superior court granted Safeway summary judgment on all of Miller's claims and denied as untimely a request by Miller to amend his complaint.[4] This court affirmed the superior court's grant of summary judgment.[5] We held that Miller's constitutional claims failed due to lack of state action.[6] We also concluded that Miller failed to demonstrate discrimination on the basis of race, sex, or religion for the following reasons:

> Miller failed to present evidence that the hair length policy was discriminatory or that he was treated less favorably than similarly qualified employees on the basis of race or gender, and he failed to provide

notice to his employer that his religious beliefs and practices conflicted with Safeway's hair length policy.[7]

But, we also "reverse[d] the trial court's denial of Miller's motion to amend his complaint" to add claims alleging wrongful termination and breach of the implied covenant of good faith and fair dealing.[8]

After Miller amended his complaint, the superior court granted summary judgment to Safeway on the additional claims. Miller appeals this grant of summary judgment.

## IV. DISCUSSION

■ A grant of summary judgment is reviewed de novo.[9] We will affirm

> if the record contains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. When considering a motion for summary judgment, all reasonable inferences of fact from the proffered evidence must be drawn against the moving party and in favor of the non-moving party.[10]

■ This court has "held that at-will employment contracts in Alaska contain an implied covenant of good faith and fair dealing."[11] An employer can breach the implied covenant as follows:

> The covenant can be breached objectively or subjectively. The objective prong of the covenant is breached when an employer fails to act in a manner that a reasonable person would consider fair, which includes treating similarly situated

1. *Miller v. Safeway,* 102 P.3d 282, 285–86 (Alaska 2004) (*Miller I*).

2. *Id.* at 286.

3. *Id.*

4. *Id.* at 287.

5. *Id.* at 285.

6. *Id.*

7. *Id.*

8. *Id.*

9. *DeNardo v. Bax,* 147 P.3d 672, 676 (Alaska 2006).

10. *Id.* at 676–77.

11. *Luedtke v. Nabors Alaska Drilling, Inc.,* 768 P.2d 1123, 1130 (Alaska 1989) (*Luedtke I*) (citing *Mitford v. de Lasala,* 666 P.2d 1000, 1007 (Alaska 1983)). In addition to the implied covenant of good faith and fair dealing, Miller also included a claim of wrongful termination in his complaint. Wrongful termination occurs when "the employer breached a contract or committed a tort in connection with the employee's termination." *Charles v. Interior Reg'l Hous. Auth.,* 55 P.3d 57, 59 (Alaska 2002). Since Miller does not claim that Safeway committed a tort, and his only contract claim is that Safeway breached the implied covenant of good faith and fair dealing, his wrongful termination claim relies entirely on the implied covenant claim.

employees disparately, terminating employees on unconstitutional grounds, and terminating employees in violation of public policy. The subjective prong of the covenant is breached when an employer is motivated by the goal of depriving the employee of a benefit of the contract. The purpose of the covenant is to effectuate the reasonable expectations of the parties, not to alter or to add terms to the contract.[12]

### A. Safeway Did Not Breach the Objective Prong of the Implied Covenant of Good Faith and Fair Dealing.

■ An employer breaches the objective prong of the implied covenant by failing "to act in a manner which a reasonable person would regard as fair." [13] There are two ways that Safeway could have breached the objective prong of the implied covenant. First, the objective prong of the implied covenant can be breached through a termination that violates public policy.[14] In *Luedtke v. Nabors (Luedtke I)* this court established that "there is a public policy supporting the protection of employee privacy," and that "[v]iolation of that policy by an employer may rise to the level of a breach of the implied covenant of good faith and fair dealing." [15] If Safeway's grooming policy violates the public policy supporting the privacy interests of its employees, then Safeway may have breached the implied covenant.

Second, even if a policy passes muster, an employer can breach the implied covenant by the manner in which it enforces the policy.[16] Therefore, even if Safeway's grooming policy does not breach the implied covenant, Safeway's actions with respect to Miller's termination may have breached it.

### 1. Safeway's grooming policy does not breach the implied covenant by violating public policy.

■ In *Luedtke I* this court articulated the public policy supporting the protection of employee privacy [17] as follows: "[T]here is a sphere of activity in every person's life that is closed to scrutiny by others. The boundaries of that sphere are determined by balancing a person's right to privacy against other public policies, such as 'the health, safety, rights and privileges of others.' " [18] The court upheld a drilling company's policy of testing employees' urine for drugs because it determined that the public policy supporting employee privacy was outweighed by the public policy supporting the protection of the health and safety of other workers.[19]

Here, Miller claims a right to wear his hair long. Justice Rabinowitz emphasized the importance of a person's right to wear one's own hair as he or she wishes in *Breese v. Smith*, which held that it was unconstitutional for public schools to regulate hairstyles:

Hairstyles have been the subject of great variety and individual taste and have traditionally been left to personal decision; they are the manifestations of our diverse and numerous individual personalities. The United States of America, and Alaska in particular, reflect a pluralistic society, grounded upon such basic values as the preservation of maximum individual choice, protection of minority sentiments, and appreciation for divergent lifestyles. The spectre of governmental control of the physical appearances of private citizens, young and old, is antithetical to a free society, contrary to our notions of a gov-

---

12. *Witt v. State, Dep't of Corr.*, 75 P.3d 1030, 1034 (Alaska 2003) (citations omitted).

13. *Luedtke v. Nabors Alaska Drilling, Inc.*, 834 P.2d 1220, 1224 (Alaska 1992) (*Luedtke II* ).

14. *Luedtke I*, 768 P.2d at 1130 (citing *Knight v. Am. Guard & Alert, Inc.*, 714 P.2d 788 (Alaska 1986)).

15. *Id.*

16. *See, e.g., id.* at 1136, 1137 (holding that even though the policy of drug testing itself did not violate the objective prong of the implied covenant, the employer had to conduct drug tests "at a time reasonably contemporaneous with the employee's work time," and the employer had to give the employee "notice of the adoption of a drug testing program").

17. *Id.* at 1130.

18. *Id.* at 1135–36 (quoting *Ravin v. State*, 537 P.2d 494, 504 (Alaska 1975)).

19. *Id.* at 1136.

ernment of limited powers, and repugnant to the concept of personal liberty. It has been observed that [there] are few things more personal than one's body and its appearance, and there could be few laws more destructive of the notion that there is a range of decisionmaking within which the individual is autonomous than a rule regulating physical makeup. Whatever else "liberty" may mean as used in article I, section 1 of the Alaska constitution, we hold that the term at least encompasses the fundamental personal right of students in our public schools to select their own individual hair styles without governmental direction.[20]

Although the *Breese* court relied on the right to liberty rather than the right to privacy,[21] regardless of how it is framed *Breese* establishes that Miller has a right to wear his hair as he chooses. But, as the superior court noted, Safeway also "has a right and privilege as a private company to operate its business in a reasonable manner of its choosing." The superior court noted that *Luedtke I* required it to balance the privacy interests of employees against the rights and privileges of others. It found that, while Miller had a constitutionally protected "liberty and privacy interest in his personal choice to wear his hair long[,] . . . Safeway's legitimate interest in its grooming policy outweighs Miller's interest in working at Safeway with long hair." We hold that the superior court correctly weighed these two interests.[22]

The superior court relied on several cases upholding grooming policies in the face of constitutional and civil rights challenges. Federal cases dealing with grooming policy are not directly on point, since they generally address either constitutional claims against state or federal employers or statutory claims that grooming policies of private employers are discriminatory. However, such cases support the idea that an employer has managerial discretion when setting reasonable standards for the appearance of its employees. In *Willingham v. Macon Telegraph Publishing Co.* the Fifth Circuit found that grooming policies are more closely related to "the employer's choice of how to run his business" than to discrimination or constitutional claims.[23] Similarly, in *Brown v. D.C. Transit System, Inc.*, the D.C. Circuit stated that "the requirement of hirsute conformity . . . [is] simply [a] non-discriminatory condition[ ] of employment falling within the ambit of managerial decision to promote the best interests of its business." [24]

Some of the hair cases also note that the employee generally has a choice in where to seek employment: "If the employee objects to the grooming code he has the right to reject it by looking elsewhere for employment, or alternatively he may choose to subordinate his preference by accepting the code along with the job." [25] The superior court emphasized this point as well, noting that "Safeway's policy only affects Miller because he made the personal choice to work for Safeway."

While the federal cases are not directly applicable, the fact that employer grooming

---

**20.** *Breese v. Smith*, 501 P.2d 159, 169 (Alaska 1972) (quotations and citations omitted).

**21.** The amendment establishing a right to privacy in the Alaska Constitution had not yet gone into effect at the time *Breese* was decided. As the *Breese* court noted, however, federal courts linked the right to wear one's hair as one pleases to several constitutional rights, including the right to free expression under the first amendment, the right to equal protection under the fifth amendment, "retained rights" under the ninth amendment, and the right to privacy emanating from the penumbra of the Bill of Rights. *Id.* at 165–66.

**22.** Our decision is based on the facts of this case and should not be construed as a broad ruling on the constitutionality of private employers' grooming policies. As we have previously noted, there is considerable controversy over the disparate impact some grooming policies may have on racial minorities and women. *See Miller I*, 102 P.3d at 292 n. 42.

**23.** 507 F.2d 1084, 1091 (5th Cir.1975).

**24.** 523 F.2d 725, 728 (D.C.Cir.1975); *see also Fagan v. Nat'l Cash Register Co.*, 481 F.2d 1115, 1124–25 (D.C.Cir.1973).

**25.** *Willingham*, 507 F.2d at 1091; *see also, e.g., Thomas v. Firestone Tire & Rubber Co.*, 392 F.Supp. 373, 375 (N.D.Tex.1975); *Page Airways of Albany, Inc. v. N.Y. State Div. of Human Rights*, 50 A.D.2d 83, 84–85, 376 N.Y.S.2d 32 (N.Y.App.Div.1975).

policies have generally been upheld in the face of statutory and constitutional challenges suggests that it would be inappropriate to upset such policies in the context of the implied covenant, which has been described as a narrow, judicially created exception to at-will employment.[26] Almost all of the federal cases dealing with statutory challenges to a private employer's grooming policy have upheld those policies as non-discriminatory.[27] The majority of federal cases dealing with constitutional claims against the grooming policies of state and federal employers have upheld the policies as constitutional.[28] If grooming policies generally pass muster in the context of state action and discrimination,[29] they should also survive claims dealing with the implied covenant of good faith and fair dealing.

We hold that Safeway's hair policy does not represent a per se breach of the implied covenant of good faith and fair dealing.

### 2. Safeway's actions with respect to enforcement of the policy did not breach the implied covenant.

▮ An employer breaches the objective prong of the implied covenant of good faith and fair dealing if it "fails to act in a manner that a reasonable person would consider

**26.** *E.g., Brodsky v. Hercules, Inc.,* 966 F.Supp. 1337, 1351 (D.Del.1997); *Johnson v. Carpenter Tech. Corp.,* 723 F.Supp. 180, 186 (D.Conn. 1989).

**27.** *See, e.g., Tavora v. N.Y. Mercantile Exch.,* 101 F.3d 907, 908 (2d Cir.1996) ("[R]equiring short hair on men and not on women does not violate Title VII. Every court of appeals that has considered this issue has agreed.") (quotations omitted); *Earwood v. Cont'l S.E. Lines, Inc.,* 539 F.2d 1349, 1350 (4th Cir.1976) (holding that a private employer's grooming policy did not constitute sex discrimination under the Civil Rights Act of 1964); *Willingham,* 507 F.2d at 1086–87 (same); *Fagan,* 481 F.2d at 1116 (same); *Smith v. Delta Air Lines, Inc.,* 486 F.2d 512, 514 (5th Cir.1973) (holding that a private employer's grooming policy did not constitute racial discrimination under the Civil Rights Act of 1964); *Wofford v. Safeway Stores, Inc.,* 78 F.R.D. 460, 470 (N.D.Cal.1978) (same) (citations omitted).

**28.** *See, e.g., Kelley v. Johnson,* 425 U.S. 238, 247–48, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976) (holding that a police department's grooming policy did not violate the liberty rights of the policemen, assuming such liberty rights existed); *Lowman v. Davies,* 704 F.2d 1044, 1046 (8th Cir.1983) (holding that the state did not violate a park naturalist's liberty rights by requiring that his hair be short); *Domico v. Rapides Parish Sch. Bd.,* 675 F.2d 100, 101–02 (5th Cir.1982) (holding that a school board's grooming policy prohibiting beards did not violate employees' liberty rights, but expressing hope that "the public, with growing thousands of entirely responsible adult members of the community wearing all sorts of hair and face trims, has come to its senses and does not see in such variations the seeds of violence and revolution") (quotations omitted); *Kamerling v. O'Hagan,* 512 F.2d 443, 445–46 (2d Cir.1975) (holding that the grooming policy for New York City firemen did not violate their constitutional rights of free expression, due process and equal protection); *Marshall v. District of Columbia,* 392 F.Supp. 1012, 1015 (D.D.C.1975) (holding that police department's grooming policy did not infringe plaintiff's free exercise rights). *But see, e.g., Black v. Rizzo,* 360 F.Supp. 648, 653 (E.D.Pa.1973) (holding that fire department's grooming policy violated the liberty rights of employees since "the only valid interest advanced by the defendants is insubstantial," but noting that if the policy had been justified in the interest of safety it would have been upheld).

**29.** It should be noted that most of the cases limit themselves to "reasonable" grooming policies. *E.g., Earwood,* 539 F.2d at 1351 ("[A] grooming regulation will be sustained unless the decision to enact the regulation or the regulation itself is so irrational that it may be branded arbitrary ....") (quotations and citations omitted); *Equal Employment Opportunity Comm'n v. Sage Realty Corp.,* 507 F.Supp. 599, 609 n. 15 (S.D.N.Y.1981) ("[A]t least seven circuits have ruled that Title VII does not prohibit an employer from making reasonable employment decisions based on factors such as grooming and dress."); *Wofford,* 78 F.R.D. at 470 (upholding "even-handed application of reasonable grooming regulations"); *Page Airways,* 50 A.D.2d at 85, 376 N.Y.S.2d 32 (upholding "reasonable rules and regulations in regard to the appearance of ... employees."). For example, in one case a federal district court held that a grooming policy that allowed women to wear long hair in hairnets but required men to have short hair was discriminatory when it was based on "the need for quality control in food processing." *Roberts v. General Mills, Inc.,* 337 F.Supp. 1055, 1056 (D.Ohio 1971). Noting that "[i]t does not appear that contamination could occur any more easily from a man's hair contained within a hairnet than a woman's," it found the rule to be unreasonable. *Id.* In *Miller I* this court also noted that there could be "a different set of circumstances ... in which an employer's grooming or appearance-based policies could give rise to a claim of sex discrimination." 102 P.3d at 293 n. 51.

fair."[30] Miller argues that Safeway violated the implied covenant by treating Miller differently than other employees. He suggests that Safeway normally made inquiries into the reasons why employees did not comply with the grooming policy but did not do so in his case. But Miller does not present any evidence indicating that Safeway had a practice of affirmatively inquiring into the reasons for not complying with its policies. Rather, the testimony he cites discusses Safeway's practices once an employee has asked for an accommodation.[31] Miller concedes that he did not disclose his reasons for not cutting his hair, but he seems to argue that Safeway should have inquired as to his reasons anyway.

We find that a reasonable person would believe that Safeway acted fairly given its lack of information about Miller's reasons for wanting to keep his hair long. Requiring employees to at least articulate their concerns before holding employers liable under the implied covenant imposes a minimal burden on employees that does not strike us as unreasonable.[32] On the other hand, it seems unduly burdensome to require employers to inquire into their employees' unexpressed reasons for non-compliance with store policies.

Miller also seems to argue that Safeway violated the implied covenant by failing to inform him that there was the possibility of a religious exemption. In *Miller I* we noted that Title VII requires employees to inform their employer of their religious belief before they can recover.[33] It would be inappropriate to establish an end run around this requirement by holding that even though there was no religious discrimination because of the employee's non-disclosure, there might be a breach of the implied covenant because the employer did not inform the employee of the possibility of accommodation.

Finally, Miller points to Safeway's policy of using a system of progressive discipline and suggests that it should have used that rather than summarily firing him. But he does not point to any evidence showing that the system of progressive discipline applied to employees such as himself. Testimony by Safeway management indicated that they decided whether or not to use progressive discipline for at-will employees on a case-by-case basis. Miller has not shown that Safeway created a reasonable expectation on his part that a progressive discipline system would be used. Rather, the first page of the Retail Policies and Procedures, which includes the grooming policy, states that "[v]iolation of these regulations and rules will result in discipline up to and including termination."

Based on these undisputed facts, we hold that Safeway did not breach the objective

---

30. *Witt v. State, Dep't of Corr.*, 75 P.3d 1030, 1034 (Alaska 2003) (citations omitted).

31. In fact, Miller's brief discusses "[t]he normal practice of the human resources section *when someone asserts a need to depart from the hair policy.*" (Emphasis added.) Since Miller did not assert such a need, this normal practice would not be triggered.

32. Miller was given information about how to request an accommodation. At the orientation meeting, Safeway provided Miller with a set of its "Retail Policies and Procedures" which included an information sheet about its "Equal Employment Opportunity/Affirmative Action Policy." When discussing accommodation in particular, the policy only references accommodations for individuals with disabilities. However, the policy also states that "[o]pportunities for success ... are available to all employees regardless of race, color, sex, national origin, religion, age, handicap/disability status, [or] status as a veteran," and that "[a]nyone who feels he or she has been discriminated against should contact

his/her supervisor or the Human Resources Department." The policy also tells employees "[i]f you have any questions or concerns regarding the Equal Employment Opportunity/Affirmative Action Policy, please feel free to discuss them with your supervisor or call your Human Resources Representative at the number listed below."

If Miller had communicated his concerns to Safeway, testimony by Safeway management suggests that he might have received an exemption. Ann Marie Williams, the Seattle Division Human Resources Manager for Safeway, testified that Safeway deals with requests for exceptions to the grooming policy on a case-by-case basis, which suggests that in some instances it does make exceptions. For example, at the time of her deposition, Safeway was researching the question of whether to allow a religious accommodation for an employee who wanted to keep his beard in violation of the grooming policy because he was a warlock.

33. 102 P.3d at 292.

prong of the implied covenant of good faith and fair dealing.

### B. Safeway Did Not Breach the Subjective Prong of the Implied Covenant of Good Faith and Fair Dealing.

 "The subjective prong of the covenant is breached when an employer is motivated by the goal of depriving the employee of a benefit of the contract."[34] The court found that "[t]here is no evidence to suggest that Safeway terminated Miller to save money or deprive him of a contract benefit. Safeway terminated Miller because he refused to comply with the grooming policy." We agree. None of Miller's arguments ever allege that Safeway was motivated by a bad faith desire to save money or deprive Miller of a contract benefit.[35] Summary judgment was appropriate with respect to this prong as well.

## V. CONCLUSION

Reasonable grooming policies do not represent a per se breach of the objective prong of the implied covenant of good faith and fair dealing. While employees have important liberty and privacy rights connected to their choice of hairstyle, an employer also has a prerogative to present itself to the public as it sees fit. The superior court's determination that the employer's right outweighs that of the employee in this context is correct. Nor did Safeway's enforcement of its policy violate the implied covenant, since its conduct was not shown to be unfair or motivated by bad faith. Therefore, we AFFIRM the superior court's grant of summary judgment to Safeway.

EASTAUGH, Justice, not participating.

---

**34.** *Witt,* 75 P.3d at 1034.

**35.** Miller claims that "Mr. Galic appears to have been motivated by the goal of depriving Mr. Miller of all of the benefits of his contract primarily out of a personal conviction that closely groomed hair was good policy for everybody and that no exceptions could be allowed for any reason." However, he fails to address the uncontested testimony that Mr. Galic did not make the decision that Miller would have to cut his hair, rather one of his superiors did.